# DECISIONS

OF THE

# SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

COMMONWEALTH *vs*. RICHARD FERGUSON.

Suffolk.    January 8, 1974. — March 27, 1974.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Identification. Robbery.. Joint Enterprise. Practice, Criminal,* Charge
to jury, Security measures in courtroom. *Words,* Reasonable doubt."

In a criminal case arising from a stabbing and robbery, where it appeared
that the victim had met the defendant three times before the crime
for periods ranging from a few minutes to an hour, that during the
commission of the crime he had observed the defendant for a few
seconds as the defendant was pulling a knife out of his back, that
about two weeks after the stabbing the victim, while in a hospital, had
picked out the defendant's photograph from six or seven photographs
shown to him by a police officer, but had stated that he could not
make a positive identification without seeing the man, there was no
error in denial of a pre-trial motion by the defendant to suppress the
photographic and later identifications irrespective of whether the
showing of the photographs in the hospital was suggestive. [6-7]

Conviction of the defendant on indictments charging armed robbery and
assault and battery with a knife was warranted by evidence that the
defendant knew that the victim was selling heroin and would have
money and knew his whereabouts shortly before the crime, that as the
victim, having heard the footsteps of three men pursuing him, was
running down a street a knife was thrown into his back, that seconds
later the victim saw the defendant pulling the knife out of his back as
another man robbed him while a third was present, and that the knife
was of such a size that its concealment by one participant in the crime
from the other two would have been difficult. [7-10]

At the trial of indictments, reference by the judge in his charge to the jury to a part of the evidence as permitting, although not requiring, the jury to make a certain inference did not unduly emphasize that part of the evidence, nor constitute an abuse of discretion. [10-11]

At the trial of indictments, it was within the discretion of the judge to give limiting instructions respecting records of prior convictions of the defendant, used to impeach his credibility, in the charge to the jury rather than at the time of their use; and it was proper to instruct the jury that they could decide how far they would regard the convictions as actually bearing on the defendant's credibility. [11-12]

No prejudicial error appeared at a criminal trial in that the judge, besides instructing the jury that they could find the defendant guilty only if they were convinced beyond a reasonable doubt, illustrated its meaning by saying the jury must have the conviction they would want in making an important decision in their personal lives, although use of this analogy were best discontinued. [12]

At the trial of indictments, there was no error in denying a motion by the defendant for a mistrial based on the ground that the defendant had been seen handcuffed in the courtroom by the jury, where the handcuffs had been promptly removed and it appeared that the incident was accidental, momentary, and isolated. [12-13]

INDICTMENTS found and returned in the Superior Court on November 21, 1972.

A pretrial motion was heard by *Brogna,* J., and the cases were tried before him.

*Timothy Wilton* for the defendant.

*Elizabeth C. Casey,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   Richard Ferguson, convicted by a jury of the crimes of robbery while armed with a dangerous weapon, and assault and battery by means of a dangerous weapon, the weapon specified under each charge being a knife, takes his appeal under the provisions of G. L. c. 278, §§ 33A-33G. He assigns eleven errors and argues ten of them. We affirm the judgments.

It will be convenient to summarize the story as told by the victim Donald Merowitz and police lieutenant Thomas Moran, called by the prosecution, and then to indicate the line taken by the defendant and his wife, the witnesses for the defence.

The criminal episode occurred on the evening of July 16, 1972. Merowitz, aged fifteen at the time, had met the defendant for about ten minutes two weeks before July 16, and again a week before, when they were together for a longer period, perhaps as much as an hour.[1] On the latter occasion Merowitz had also met a young woman called Lulu and understood the defendant to be "Lulu's man." Merowitz did not know that the defendant and Lulu were married, nor did he know their last name. About 8:15 P.M. to 8:30 P.M. on July 16, Merowitz encountered Lulu and the defendant on Westland Avenue in the Fenway neighborhood of Boston.

Merowitz asked Lulu, in the presence of the defendant, whether she wanted to "cop," that is, buy heroin. Lulu indicated that she did. Merowitz and Lulu started to walk together toward Edgerly Road, while the defendant headed in another direction. Reaching a rooming house at 22 Edgerly Road, Merowitz and Lulu entered and went to a common hallway bathroom where Merowitz sold her three bags of heroin for $30 and Lulu "shot" the drug. Merowitz placed the $30 with the $170 already in his wallet in his back pocket. He had still on his person two or three bags of the bundle of twenty-five bags that he had been selling. Shortly Merowitz left the building with Lulu, the two turning to their right and walking in the middle of the street on Edgerly Road toward Westland Avenue. This was about 8:30 P.M. to 8:45 P.M.

Merowitz then heard footsteps of three persons running behind him in apparent pursuit. Alarmed, he started to run, continuing in the same direction on Edgerly Road and then commencing to turn at the corner of Norway Street. At that moment Merowitz felt the impact of a thrown knife entering his left lower back. Evidently the blow forced him into a leaning position on a parked car. He screamed, "Take the knife out"; one or perhaps two of the three

---

[1] Most of the time Merowitz was seated next to the defendant in a car. Merowitz and the defendant were serving as intermediaries in the sale of a drug to a friend of Merowitz, who was driving the car.

persons now close behind him also shouted to take the knife out. As he felt the knife being removed, he turned his head. In the light of a street lamp overhead, he saw Lulu's man pulling out the knife. At the same time he recognized one William LaChardy, blackjack in hand, shouting "Give me the . . . money." There was a third person present whom he evidently did not squarely see. LaChardy took the wallet, but did not search for or take the heroin bags. The robbery accomplished, the three fled. Lulu had disappeared. The episode from the time the men came up to Merowitz to their departure had occupied perhaps thirty or forty seconds. Merowitz managed to get to Hemenway Street where he hailed a taxicab. He was taken to Peter Bent Brigham Hospital.

At about 9:15 P.M. Lulu appeared at the fourth district police station at Warren and Berkeley Streets and told Lieutenant Moran of a knifing at Norway Street corner. Lieutenant Moran drove Lulu to the spot and observed blood on the sidewalk. He then proceeded to the hospital but was unable because of Merowitz's condition to interview him at that time, nor was he able to do so for two weeks thereafter. When finally the interview took place, Lieutenant Moran, in the presence of another officer, showed Merowitz six or seven pictures,[2] including pictures of the defendant and the brothers William and Joseph LaChardy, and asked Merowitz whether he recognized any of the faces. Merowitz identified William LaChardy as one of his assailants, but he passed over Joseph LaChardy's picture. He picked out the defendant's picture as being that of Lulu's man but he said he could not be sure of the identification until he saw the man in the flesh.[3] Merowitz remained in the hospital until mid-August. Hospital records showing that he underwent three operations were received as bear-

---

[2] Apparently Merowitz in testimony prior to the motion to suppress had indicated the number was three, but he later concurred with Lieutenant Moran.

[3] The testimony suggests there was a change of the defendant's appearance (presence of goatee and moustache) between the date of the picture and July, 1972.

ing on his condition when he was shown the pictures.[4]

On October 6, 1972, Merowitz, while riding in a friend's car on Washington Street in Boston, saw the defendant standing outside the Novelty Bar. Merowitz and his friend entered the bar and Merowitz observed the defendant there for several minutes. He was sure this was the man. He left the bar and telephoned the police who came and made the arrest.

Turning to testimony for the defence, Lulu said that though the defendant was present when Merowitz asked whether she wanted to "cop," he had not heard or understood the question, and she had led him to think that Merowitz had inquired where he, Merowitz, could "cop." She walked with the defendant to a "Chicken-a-Go-Go" on Westland Avenue where the defendant put in an order; she said she would wait outside; she stepped out and accompanied Merowitz to 22 Edgerly Road where she bought the heroin. (She said she misled or evaded the defendant because he was trying to break her of the habit.) She said that three men pursued Merowitz: she recognized the LaChardy brothers and the third was a "junkie" whom she knew only by sight. She was twenty-five to thirty feet from Merowitz when the knife was thrown, and ten to fifteen feet from the person who took the knife out. Merowitz slumped to the ground, his hands on a parked car.

The knife was in so deep, according to Lulu, that William LaChardy had to kick Merowitz in the back to get it out. She said (on cross-examination) that it was a "big," "good sized knife," like a carving knife and the size of a carving knife, something you would use in cutting up a roast. The blade was "probably maybe that long, six, seven inch blade." She didn't know if it had a wooden handle. It wasn't simply a jackknife or a pocket knife.

Lulu testified that the sight of the knifing made her hysterical; she cried out for someone to give Merowitz

---

[4] The defendant complains that these records may have had a prejudicial effect on the jury which overcame their probative value, and so should have been excluded (assignment 2), but we do not agree.

money so he could get to a hospital. But the men ignored her, took a bundle of heroin from Merowitz, but not his money, and fled. She left Merowitz there and went back to Westland Avenue where she found the defendant sitting on a stoop eating chicken. She gave him a muddled story of the stabbing and to quiet her and get her out of the area he walked with her to a bar at Park Square (where they would be recognized) and they stayed there drinking for perhaps an hour. Then she stepped out and went to see Lieutenant Moran and named the LaChardy brothers, who were well known to herself and the defendant. In going to the police she was moved by a fear that Merowitz might die.

The defendant, testifying in his own defence, denied any personal knowledge of the stabbing. He had been at "Chicken-a-Go-Go." He said Lulu had not told him any details. She had not mentioned the LaChardy brothers to him. She had not told him who did it. He did not know she had gone to Lieutenant Moran. He had not connected Merowitz with the stabbing, nor had he recognized him at the Novelty Bar.

1. The judge's denial of the defendant's pre-trial motion to suppress the photographic and later identifications is assigned as error (assignment 1). We need not state separately the evidence on the motion as it did not differ in substance from that emerging at trial, as recounted above; the witnesses on the motion called by the defendant were only Merowitz and Lieutenant Moran. The defendant says that the showing of his picture at the hospital was impermissibly suggestive, whence it would follow, he argues, that any later identifications, in court or out, were tainted. The judge did not say whether he thought the showing in the hospital was suggestive, holding rather that there was "no identification through photograph on the evidence"; it will be recalled that Merowitz wanted to see the man in the flesh before he would commit himself. There is no indication in the record that Merowitz was pointed or nudged toward the defendant's photograph, see *Commonwealth* v. *Ross,* 361 Mass. 665, 673 (1972); *Simmons* v. *United States,*

390 U. S. 377, 384 (1968), and Merowitz's hesitation in making a positive identification at that time may indeed be taken as a sign of his circumspection. If, however, we were to assume that there was something suggestive in the display at the hospital, we would nevertheless agree with the judge's finding, in effect, that Merowitz's observations of the defendant's appearance at the three encounters before the stabbing, and his view of the defendant at the climactic moments of the withdrawal of the knife, in themselves provided a sufficient basis for his later positive identifications; the identifications stemmed from those observations rather than from the viewing of the picture. *Commonwealth* v. *Ross, supra,* at 673, and cases cited. *Commonwealth* v. *Murphy,* 362 Mass. 542, 544-545 (1972). *Commonwealh* v. *Stanley,* 363 Mass. 102, 104 (1973). *United States* v. *Wade,* 388 U. S. 218, 241 (1967). Thus we think the judge was not in error in denying the motion to suppress and in admitting the testimony regarding identifications to be weighed by the jury.

2. If the man who pulled out the knife was properly identified as being the defendant, then there was sufficient evidence to indicate that he joined with two others to rob Merowitz. We need not necessarily infer that Lulu "set up" Merowitz for the defendant and any whom he might invite into the enterprise. But there was testimony indicating that the defendant knew Merowitz's whereabouts and movements around the time of the crime, and knew that Merowitz was selling heroin and would have at least Lulu's contribution and probably more in his pocket. It is suggested in argument that the defendant may not have been one of the pursuers and may have arrived independently at the place to perform only the act of removing the knife. But considering especially the very short time span between Merowitz's awareness that he was being waylaid and the consummation of the robbery, there was good ground for the jury to conclude that the defendant was not an outsider but an actor in the plot.

The Commonwealth, therefore, might readily have pro-

ceeded against the defendant on charges of simple (unarmed) robbery and simple assault. But the two crimes in fact charged comprised as additional elements, respectively, possession of a knife in the course of a robbery, and use of a knife as a means of committing assault and battery; and as there was no distinct proof, although some likelihood, that the defendant himself carried or threw the knife, the judge was obliged to deal with the issue of complicity of the defendant with a confederate who did possess and wield the knife. The general position taken by the judge—as appears from his instructions, to be considered later—was that it had to be shown that the defendant knew that one of the assailants had a knife; the defendant could then be held criminally responsible not only for its possession, but also for its wrongful use. (As to the wrongful use, if the defendant had knowledge of and thus acquiesced in the carrying of the knife, he could be found to have been willing to see the knife used as a means to the desired end. See *Commonwealth* v. *Richards,* 363 Mass. 299, 308 [1973].) This seems a fair formula to apply as to the mental element (besides the active participation) required to establish accessorial responsibility for assault and battery by means of a dangerous weapon. See the discussion in *Commonwealth* v. *Stasiun,* 349 Mass. 38, 47-49 (1965); *Commonwealth* v. *Benders,* 361 Mass. 704, 707-708 (1972); *Commonwealth* v. *Richards, supra,* at 305-308; *Commonwealth* v. *Clark,* 363 Mass. 467, 472-473 (1973); *Commonwealth* v. *Morrow,* 363 Mass. 601, 608-609 (1973). One of our cases can be read as suggesting that for armed robbery it may be enough that the accomplice intends the robbery even though he does not advert to the presence of a dangerous weapon, the possession being seen as merely an aggravation of the robbery. See *Commonwealth* v. *Nickologines,* 322 Mass. 274, 276-277 (1948). But in the cited case the defendant had in fact plotted the robbery and there was merely a claimed agreement among the partners that it "was best not" to use a gun. The question need not be discussed further here. For, assuming a legal requirement

that "knowledge" of the knife be fastened on the defendant in order to convict him of each crime, we think that there was enough evidence to justify denial of the motions for directed verdicts of acquittal made at the close of the Commonwealth's case (assignment 3) and renewed at the close of all the evidence.

The probability that the defendant had "knowledge"[5] could be brought home to the defendant "circumstantially" or inferentially, just as other elements leading to a finding of guilty complicity could be. Cf. *Commonwealth* v. *Soroko*, 353 Mass. 254 (1967); *Commonwealth* v. *Medeiros*, 354 Mass. 193 (1968); *Commonwealth* v. *Breen*, 357 Mass. 441 (1970); *Commonwealth* v. *Burns*, 362 Mass. 875 (1972). But cf. *Commonwealth* v. *Fancy*, 349 Mass. 196 (1965); *Commonwealth* v. *Perry*, 357 Mass. 149 (1970). There was no proof of prior discussion or consultation among the actors which often appears in cases of armed robbery or other crimes committed by multiple offenders, and provides a basis for reasoning about the participants' awareness of or intentions with respect to weapons. But there was evidence of a common venture, and a person joining in a robbery under conditions like the present, and apprehending that the intended victim might resist, could suppose that the other actors might be furnished with weapons, and in fact a knife, and evidently also a blackjack, were used. From a defence witness, Lulu, there was testimony about a difficulty in dislodging the knife, and from the same witness, testimony elicited on cross-examination about the characteristics of the knife, inviting an inference as to whether concealment of the weapon was possible or easy. Also to be laid on the scales is a likelihood, already mentioned, that the defendant knew of the knife because he himself threw it.

"[W]here competent evidence has been introduced in support of all the material allegations of an indictment, the

---

[5] Including opportunity for the defendant to withdraw from the venture in the light of that knowledge.

weight and sufficiency of such evidence are ordinarily for the jury . . . ." *Commonwealth* v. *Hollis*, 170 Mass. 433, 436 (1898). See *Commonwealth* v. *Holiday*, 349 Mass. 126, 129 (1965). In this view it cannot make a difference that — for example — Lulu's testimony about the knife, even though hurtful to the defendant, may have been offered irresponsibly to lend verisimilitude to her other claimed observations, including notably the absence of the defendant from the scene; nor does it matter that the jury must be taken to have disbelieved Lulu as to the nub of the rest of her story.[6]

3. Coming to the judge's charge, his instruction as to the requirement of proof of "knowledge" accorded with his position on the law set out above, which we need not repeat. The defendant apparently did not object to the judge's instruction in principle, and a number of his exceptions addressed to details of the judge's statement, and to his refusal to elaborate as suggested in defendant's requests to charge, seem inconsequential (assignments 8 and 10).

The defendant excepted to the judge's instruction that the jury could, though they were not obliged to, infer knowledge from the size of the knife as bearing on ease of concealment (assignment 9). This instruction, the defendant now argues, placed undue emphasis on one feature of the evidence, and intimated an opinion on the part of the judge unfavorable to the defendant. We do not find error, recalling *Cahalane* v. *Poust*, 333 Mass. 689, 693 (1956), where we said that "it is within the wide discretion of the judge to determine what parts of the evidence should be referred to. Inevitably there will be emphasis by selection

---

[6] We think the judge acted correctly in his denial of the original motions for directed verdicts as well as the renewed motions at the close of the case. See G. L. c. 278, § 11. Thus we do not reach, and express no opinion about, a situation where the evidence at the close of the Commonwealth's case is such that a directed verdict of acquittal could then have been properly granted but was in fact denied, and the defendant, choosing not to rest on the Commonwealth's case, offers evidence which supplies deficiencies in the Commonwealth's case and supports a conviction. See LaFave & Scott, Criminal Law, § 8, pp. 53-55 (1972); A. B. A. Standards Relating to Trial by Jury, § 4.5, pp. 107-108 (Approved Draft 1968); but see *Cephus* v. *United States*, 324 F. 2d 893 (D. C. Cir. 1963); Comment, 70 Yale L. J. 1151 (1961). Cf. *Commonwealth* v. *Lussier*, 333 Mass. 83, 88 (1955).

and by reference but if the jury draw conclusions therefrom it will be primarily the facts of the case, properly marshalled for their review, and not the personal views of the judge, which will be speaking to them."[7]

4. The question is raised whether the Commonwealth may not have been erroneously relieved of some part of its proper burden of proof by the judge's instructions relating to credibility and the degree of certitude needed to convict. The instructions might well have been differently phrased, but we do not think they involved material error. Prior convictions of the defendant for unlawful possession of drugs were used by the Commonwealth to impeach the defendant as a witness.[8] The defence asked the judge to give a limiting instruction — that the convictions were being received only as bearing on credibility — immediately following the receipt of this proof rather than in the charge at the close of the case (which, however, was not in fact far distant). The judge chose the latter course (assignment 6), but this was a discretionary matter. *Commonwealth* v. *Flynn*, 362 Mass. 455, 468 (1972). When he instructed on the point, he added that he left it to the jury how far they would regard the convictions as actually bearing on the witness's credibility. This was proper, and has been customary. Better still would have been a fuller explanation by the judge that the inferences as to credi-

---

[7] The instruction did not stop with the possible inference of knowledge from the size of the knife but also spoke of a likelihood that weapons would be carried by those combining to commit robbery. The judge also stated that the jury were not to be affected by the fact that he might single out particular parts of the evidence for comment.

There was no objection to a slip by the judge when he said that "various witnesses" had held up their hands to indicate "eight to ten inches or seven to ten inches, but it is your memory." Lulu was the only witness; she had mentioned six or seven inches but also referred to the size of a carving knife (apparently using gestures to demonstrate).

[8] The prosecutor read off the prior convictions from the original records instead of introducing certified copies, which is the more usual practice. Assignment 5 seeks to make something of this, but relies upon the quite separate rule that prior convictions cannot be proved by eliciting admissions about them in cross-examination of the witness being impeached. See *Commonwealth* v. *Walsh*, 196 Mass. 369 (1907); *Commonwealth* v. *Connolly*, 356 Mass. 617, 627 (1970); *Ford* v. *Kremer*, 360 Mass. 870 (1972). The requirement is that the records themselves must be used, and that was done here.

bility which can rightly be drawn from convictions vary according to the nature of the crimes. See *Commonwealth v. DiMarzo,* 364 Mass. 669, 678 (1974), and concurring opinion of Hennessey, J., at 682-683. Cf. *Commonwealth v. Bumpus,* 362 Mass. 672, 682-683 (1972).

The jury were told that they could find the defendant guilty only if they were convinced beyond a reasonable doubt, but the further commentary by the judge (assignment 7) was not helpful, though apparently it has been quite usual. He said the minds of the jury must be brought to the level of conviction they would want[9] in making an important decision in their personal lives, citing a number of examples. We have had occasion to say that the analogy suggested is not entirely apt because in everyday experience the questions that present themselves as important are sometimes not susceptible of a judgment of high certitude. *Commonwealth v. Bumpus, supra,* at 681-682. And it has been suggested that in out-of-court situations a person may not have the practical option of refusing to take action unless thoroughly persuaded; in a criminal case a jury should render a verdict of guilty only if so persuaded. Cf. *United States v. Wright,* 365 F. 2d 135, 140 (7th Cir. 1966), cert. den. 386 U. S. 918 (1967). Although use of the analogy were best discontinued, we do not believe it operated unjustly here. The words "beyond a reasonable doubt" are themselves evocative and the jury were also told that they must be "sure" though they need not be absolutely sure,[10] and that the degree of certainty needed in civil matters was far less than that in criminal cases. Cf. *Commonwealth v. Libby,* 358 Mass. 617, 621 (1971); *Commonwealth v. Bumpus, supra,* at 681-682.

5. At the opening of the second day of trial, counsel

---

[9] The level one would "want" may be higher than that upon which one would be "willing to act," a phrase that has appeared often in the cases.

[10] The judge also said he was not too fond of the expression that a reasonable doubt is one to which you can assign a reason, though that had been used by judges (see *Commonwealth v. Gerald,* 356 Mass. 386 [1969]; *Commonwealth v. Bumpus, supra,* at 682, for a person seeking a reason could always find one.

stated to the judge that the defendant had just appeared in the court room wearing handcuffs and the jury had observed him in that condition. The handcuffs had evidently been promptly removed. Counsel sought a mistrial which was denied (assignment 4)[11] and no further action by the judge was requested or taken.[12] The occurrence seems to have been accidental, momentary, and isolated, and we cannot say that in the particular setting the judge is shown to have abused his discretion in deciding that it was better passed over than lingered on. See *Way* v. *United States,* 285 F. 2d 253, 254 (10th Cir. 1960); *Hardin* v. *United States,* 324 F. 2d 553, 554 (5th Cir. 1963); *Glass* v. *United States,* 351 F. 2d 678, 681 (10th Cir. 1965); *Gregory* v. *United States,* 365 F. 2d 203, 205 (8th Cir. 1966), cert. den. 385 U. S. 1029 (1967). It may be noted that the trial was before our decision of *Commonwealth* v. *Brown,* 364 Mass. 471 (1973), setting forth some future guidelines, among other things as to the procedures to be followed by the judge and counsel in making a contemporaneous record when questions of unusual court room security measures arise.

*Judgments affirmed.*

---

[11] The defendant had also objected to being put in the dock, as to which see *Commonwealth* v. *Jones,* 362 Mass. 497, 500-501 (1972).

[12] Some of the expedients available in such a situation are described in *O'Shea* v. *United States,* 400 F. 2d 78 (1st Cir. 1968), cert. den. 393 U. S. 1069 (1969), and *United States* v. *Larkin,* 417 F. 2d 617 (1st Cir. 1969).