COMMONWEALTH vs. JAMES J. WATSON
(and a companion case[1]).

Suffolk.  November 3, 1982. — March 23, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Felony-Murder Rule.  Homicide.  Hypnosis.  Evidence,* Hypnotically
   aided testimony.  *Delinquent Child.  Practice, Criminal,* Transfer
   hearing, Instructions to jury, Capital case.

At a transfer hearing pursuant to G. L. c. 119, § 61, to determine whether
   a juvenile should be tried as an adult, the judge did not err in concluding
   that the juvenile presented a significant danger to the public and was not
   amenable to rehabilitation as a juvenile; nor did the judge err in admit-
   ting in evidence the juvenile's file in the Department of Youth Services,
   in permitting an acting regional director of the department to express his
   opinion that the juvenile was not a fit subject for the department, and in
   allowing an assistant school principal to testify to the circumstances in
   which the juvenile had been suspended from school.  [539-540]
At the trial of two defendants charged with murder, admission of identi-
   fication testimony from a witness who had been hypnotized after the
   crime and who, before the hypnotic sessions, had positively identified
   one of the defendants and had identified the second with "about eight
   out of ten" certainty did not prejudice either defendant, where the on-
   ly demonstrated effect of hypnosis was the witness's increased certain-
   ty of his identification of the second defendant and where the jury
   were given a full opportunity to assess the possible effects of hypnosis
   on the witness's testimony.  [540-542]
Pursuant to G. L. c. 278, § 33E, this court ordered a new trial for a de-
   fendant convicted of murder in the first degree as a result of a robbery
   of a taxicab driver during which an accomplice of the defendant fatal-
   ly shot the driver, where the judge had failed to charge the jury that
   the defendant could be found guilty of felony-murder based on armed
   robbery only if he knew that his accomplice had a gun.  [543-546]
   NOLAN, J., joined by HENNESSEY, C.J., and LYNCH, J., dissenting.
At a murder trial arising from the fatal shooting of a taxicab driver by an
   accomplice of the defendant during a robbery, there was sufficient
   evidence to warrant the jury in finding that the defendant was guilty
   of deliberately premeditated murder.  [547-548]

[1] Against Frederick Clay.

INDICTMENTS found and returned in the Superior Court Department on January 22, 1980, and March 25, 1981, respectively.

Motions to dismiss and to suppress evidence were heard by *Brogna*, J.

A motion to suppress evidence was heard by *Irwin*, J., and the cases were tried before him.

*Thomas G. Shapiro* for Frederick Clay.

*Walter T. Healy* for James J. Watson.

*M. Catherine Huddleson*, Assistant District Attorney (*John N. Tramontozzi*, Legal Assistant to the District Attorney, with her) for the Commonwealth.

WILKINS, J. The defendants were convicted of the murder in the first degree of Jeffrey S. Boyajian. They appeal from their convictions, raising a common challenge to the admission of testimony from a witness who had been hypnotized and raising individual challenges on certain other issues. We conclude that Clay, who was a juvenile at the time of the crime, was properly transferred from the juvenile system for trial pursuant to the adult system. Neither defendant was substantially prejudiced, in the circumstances, by the admission of testimony from a witness who had been hypnotized. We find no justification pursuant to our duty under G. L. c. 278, § 33E, to alter the verdict as to Clay and affirm his conviction. Although we conclude that there was sufficient evidence to warrant Watson's conviction on the theory of deliberately premeditated murder with malice aforethought, the judge's charge on felony-murder did not place before the jury the crucial question whether Watson had knowledge of Clay's possession of a weapon so as to warrant Watson's conviction of murder in the first degree based on the theory of felony-murder. Therefore, because the jury may have found Watson guilty solely on the theory of felony-murder and because the omission of a charge concerning Watson's knowledge of Clay's possession of a gun presents a substantial likelihod of a miscarriage of justice (G. L. c. 278, § 33E), we order a new trial as to Watson.

We summarize the evidence against the defendants tending to show their guilt, leaving certain further details for presentation in the course of our discussion of particular issues. On November 16, 1979, about 4 A.M., Richard Dwyer was seated in a parked taxicab on Washington Street in downtown Boston. He saw three young men, two tall and one short, cross the street toward him and enter ITOA taxicab No. 649 which was parked immediately in front of his taxicab. The taxicab drove off. Later that day, after learning of the death of the driver of ITOA taxicab No. 649, Dwyer called the police, went to a police station, and made a positive identification of a picture of Watson and an eighty percent certain identification of a picture of Clay. Dwyer was then subjected to hypnotism and thereafter made a positive identification of Clay's picture as that of the short man. He continued to be positive of his identification of Watson's picture. Eleven days later, Dwyer was hypnotized again, and his opinion did not change. He never positively identified the third man. At trial, the fact of Dwyer's pretrial identification of photographs of Watson and Clay was admitted in evidence, including the change in his confidence in his identification of Clay after hypnosis. Dwyer identified the defendants in the courtroom as well.

About 4:20 A.M. on the same morning, Neal Sweatt, a resident of an apartment on Brookway Terrace in the Archdale Housing Project, in the Roslindale section of Boston, went to a parlor window, after his mother had called, "Look, they're pulling a cab driver . . . out of the cab." Sweatt testified that he recognized Watson, whom he had seen previously but whose name he did not know, and Clay, whose first name he knew. They and the third man pulled Boyajian from the taxicab. Sweatt heard Boyajian say, "Take what you want, but let me live." The three men beat Boyajian. While Watson held Boyajian, Clay went through his pockets. Boyajian threw an object which Clay retrieved. Watson released Boyajian and disappeared from sight momentarily. Then Sweatt saw Clay point an arm in Boyajian's direction. He heard at least three shots, after

which the three men ran away together. Parts of Sweatt's testimony, but not the identifications, were corroborated by his mother and by a friend of Sweatt, each of whom was looking out a window in the parlor. There was evidence that Boyajian was shot five times in the head.

1. Clay, who was sixteen at the time of the murder, challenges the decision of a judge sitting in the Juvenile Session of the West Roxbury District Court, acting pursuant to G. L. c. 119, § 61, to dismiss the juvenile complaint and to order a criminal complaint to issue. After Clay's indictment, a judge of the Superior Court considered and denied Clay's motion to dismiss, which challenged the propriety of the transfer order.

We have reviewed the Juvenile Session judge's findings and conclude that they were warranted by the evidence. There was, to be sure, evidence that Clay was amenable to rehabilitation as a juvenile. The judge found the views of certain experts unpersuasive. Certainly he was not bound by their views. See *Two Juveniles* v. *Commonwealth*, 381 Mass. 736, 744-745 (1980). He found on clear and convincing evidence that (1) Clay presented a significant danger to the public and (2) Clay was not amenable to rehabilitation as a juvenile. He considered the five factors stated (*a*) through (*e*) in G. L. c. 119, § 61. He made subsidiary findings indicating the bases for his conclusions. See *A Juvenile* v. *Commonwealth*, 370 Mass. 272, 282 (1976).

There was no error in the admission of particular items of evidence at the transfer hearing. In his discretion, the judge was warranted in admitting the opinion of the acting regional director of Region 6 of the Department of Youth Services (DYS) that Clay was not a fit subject for the DYS. It is important that the witness had twenty-seven years' experience in the system. See *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 430 (1974). Further, it was within the judge's discretion to admit Clay's entire DYS file and to permit an assistant school principal to testify to the circumstances under which Clay had been suspended from school, three times, in 1978 and 1979. Under G. L. c. 119, § 61,

the judge is to consider the child's "court and juvenile delinquency record, if any," and his "school and social history." The test is "fundamental fairness" (see *McKeiver* v. *Pennsylvania,* 403 U.S. 528, 543 [1971] [plurality opinion]), and not the application of rules of evidence concerning the admission of hearsay. See *Breed* v. *Jones,* 421 U.S. 519, 537-538 (1975); *Kent* v. *United States,* 383 U.S. 541, 562 (1966). Although the content of such information as DYS records and the reasons for school discipline must be analyzed with care to determine its trustworthiness, a blanket prohibition on the admission of such information is not required. Clay does not point to any specific item in the DYS file or in the testimony of the assistant school principal whose admission was fundamentally unfair because of its lack of trustworthiness or its substantially prejudicial quality. We conclude that there was no error in the transfer of Clay for prosecution as an adult.

2. The defendants argue that they were prejudiced by the admission of testimony from Richard Dwyer, the taxicab driver, who had been hypnotized on two occasions after the crime. Prior to his hypnotic sessions, Dwyer had positively identified a photograph of Watson as one of the three men he had seen enter the taxicab shortly before its driver was shot. He was "about eight out of ten sure" that a photograph of Clay he saw before hypnosis was that of another one of the three men. After hypnosis, he was positive about both identifications.

In our opinion in *Commonwealth* v. *Kater, ante* 519, 524-531 (1983), released today, we considered extensively the question of the admissibility of testimony from a witness who has been hypnotized. We concluded that testimony is admissible from a witness as to his or her present memory of events remembered prior to hypnotism and that hypnotically aided testimony (that is, testimony that was not available prior to hypnosis) is inadmissible. We recognized that hypnotism itself and the manner in which an hypnotic session was conducted would be appropriate subjects of inquiry when testimony is proffered from a previously hypnotized witness concerning events as remembered prior to hypnosis.

In this case, the only demonstrated effect of hypnosis was Dwyer's increased certainty of his identification of Clay's photograph. It is just such an increased level of confidence that some experts say hypnosis often produces. The process of hypnotizing Dwyer produced no new evidence against either defendant. We are, therefore, not dealing with what we have called hypnotically aided testimony. We are, however, dealing with the fact that hypnosis apparently enhanced Dwyer's confidence in his identification of Clay.

The jury heard extensive testimony concerning the hypnotic sessions, including a tape recording of each session.[2] They heard from Dr. Martin Reiser, who testified for the Commonwealth as an expert on hypnosis, and from Dr. Martin Orne, the defendant's expert. The jury were given a full opportunity to assess the possible effects of hypnosis on Dwyer's testimony. The judge instructed the jury to consider the influence of hypnosis on Dwyer's testimony. Although the procedures for the conducting of hypnotic sessions that we have suggested as reasonable were not followed in all respects in conducting the hypnotic sessions, possible weaknesses in the procedures used were fully aired before the jury.[3]

As to the defendant Watson, we have no difficulty in concluding that he was not prejudiced by the admission of Dwyer's testimony following hypnosis. The evidence showed that Dwyer's identification of Watson's photograph

---

[2] Prior to trial, a judge, not the trial judge, held a hearing on Watson's motion to suppress Dwyer's testimony because Dwyer had been hypnotized. He denied the motion. For reasons over which the trial judge had no control and contrary to what he correctly regarded as appropriate practice, Clay's similar motion was not passed on before trial and was considered during the trial, he and the jury hearing the evidence at the same time. The trial judge denied Clay's motion to suppress.

[3] We said in *Commonwealth* v. *Kater, supra* at 526-531, that a jury could not be expected to evaluate whether testimony was created as a result of hypnosis, but that we would allow proponents and opponents of testimony based on prehypnotic memory to present expert evidence as to the effect on the manner and certainty of that testimony. The events here fit this latter situation.

was a confident one, both before and after the hypnotic sessions. There was evidence that Watson admitted to his girl friend that he had been present at the scene of the crime. Sweatt, who had previously seen Watson in the neighborhood, also identified him. Dwyer's testimony concerning his prehypnotic identification of Watson's photograph and his identification of Watson in the courtroom was properly admitted. See *Commonwealth* v. *Kater, supra* at 528-529. In the circumstances, where Dwyer's certainty was unchanged by hypnosis, Watson was not prejudiced by the admission of Dwyer's posthypnotic identification of that photograph. See *Commonwealth* v. *Stetson,* 384 Mass. 545, 552-554 (1981).

We reach the same conclusion as to Dwyer's identifications of Clay's photograph and his identification of Clay at the trial. The circumstances of Dwyer's hypnosis and its possible effect on his testimony were presented to the jury. The evidence demonstrated that hypnosis could, and likely did, enhance Dwyer's confidence. In his closing argument, the prosecutor asked the jury to disregard Dwyer's posthypnotic certainty and only to use Dwyer's prehypnotic identification as corroboration of Sweatt's identification of Clay.[4] In these circumstances, considering the entire record, we conclude that Clay was not prejudiced by the admission of testimony concerning Dwyer's posthypnotic positive identification of Clay's photograph or by Dwyer's in-court identification of Clay.[5]

---

[4] The prosecutor said, in this respect: "And I will ask you this: to consider the testimony of Richard Dwyer only in so far as it corroborates Neal Sweatt. And I ask you from the Commonwealth's point of view to disregard any identification of Frederick Clay over eighty percent, or over 'somewhere around an eight,' or over 'pretty sure.' Because on his prehypnotic testimony, corroborated by Detective Berlo, he tells you that when he came to the police station, before he was hypnotized, he picked out a photograph of two people — two photographs. One positively: Watson. And one 'pretty sure': Clay.

"And ask yourself, doesn't that corroborate what Neal Sweatt has told you here?"

[5] At the retrial of Watson, which we have ordered for other reasons, the Commonwealth will have no right, in its case in chief, to present evidence

3. Watson challenges the constitutionality of the felony-murder rule. Recently, but after the trial of this case, we considered the application of the felony-murder rule in particular situations. See *Commonwealth* v. *Moran*, 387 Mass. 644, 647-651 (1982) (unarmed robbery); *Commonwealth* v. *Matchett*, 386 Mass. 492, 501-508 (1982) (extortion). We concluded that the rule may properly be applied "only if the jury find from the circumstances of the felony that the defendant consciously disregarded risk to human life." *Commonwealth* v. *Moran, supra* at 651. We must consider the applicability of the principles announced in the *Matchett* and *Moran* cases to the circumstances of Watson's conviction of murder in the first degree. *Id.* at 650.

The judge did not charge the jury on the possibility of finding Watson guilty of murder in the first degree based on the felony of unarmed robbery. Because the maximum penalty for unarmed robbery is a sentence of imprisonment in the State prison for life (G. L. c. 265, § 19), a conviction of murder in the first degree could be based on the death of the victim in the course of the commission of the felony of unarmed robbery. G. L. c. 265, § 1. If the judge had charged the jury on the possibility of unarmed robbery being the underlying felony, without instructing them that they must find from the circumstances of any unarmed robbery that Watson consciously disregarded risk to human life, we would have to direct that there be a new trial, as we did in the *Moran* case.

Here we are dealing with a jury charge on felony-murder in which the only underlying felony presented for the jury's

of Dwyer's posthypnotic photographic identification of Watson or of Clay. Watson may wish to raise the question of the effect of hypnosis on Dwyer's in-court testimony and may do so under the principles announced today in *Commonwealth* v. *Kater, supra* at 529-531. If, for some reason, Watson wishes to present evidence as to the consequences of Dwyer's hypnosis on the confidence of his identification of Clay, Watson may do so, but, if he does, the Commonwealth should be allowed to present testimony concerning Dwyer's continued posthypnotic confidence of his identification of Watson. In any event, Dwyer will be entitled to identify Watson in court and to testify to his prehypnotic identification of a photograph of Clay.

consideration was armed robbery. In the circumstances of this case, involving the use of a gun, the armed robbery inherently involved a conscious disregard of risk to human life so as to justify Watson's conviction of murder in the first degree on the theory of armed robbery, provided the jury were properly instructed as to what they had to find in order to return such a verdict against Watson.

Watson could not be guilty of murder in the course of the commission of armed robbery unless he knew that Clay had a gun. Such a factual finding is essential to a finding that Watson was guilty of felony-murder. Our cases concerning accessorial responsibility for the possession of a weapon by another have involved circumstances in which the person not in possession of the weapon knew that the other person had a weapon. See *Commonwealth* v. *Ferguson,* 365 Mass. 1, 8 (1974); *Commonwealth* v. *Clark,* 363 Mass. 467, 472-473 (1973); *Commonwealth* v. *Richards,* 363 Mass. 299, 308 (1973); *Commonwealth* v. *Benders,* 361 Mass. 704, 707-708 (1972).[6] In the *Ferguson* case, where the charge was assault and battery by means of a dangerous weapon, we observed that the defendant's knowledge of his accomplice's possession of a weapon "seems a fair formula to apply as to the mental element (besides the active participation) required to establish accessorial responsibility." *Commonwealth* v. *Ferguson, supra* at 8.[7]

---

[6] In *Commonwealth* v. *Mangula,* 2 Mass. App. Ct. 785, 790 (1975), the Appeals Court, citing the *Ferguson* case, assumed for the purposes of that case that "to be found guilty of armed robbery the defendant must have had knowledge of the possession of the weapon by his joint venturers." Where a defendant is charged as an aider and abettor of an aggravated robbery, requiring proof of use of a dangerous weapon, "the Government must show that the accomplice knew a dangerous weapon would be used or at least that he was on notice of the likelihood of its use." *United States* v. *Sanborn,* 563 F.2d 488, 491 (1st Cir. 1977). See *State* v. *Plakke,* 31 Wash. App. 262, 266-267 (1982), citing *Commonwealth* v. *Ferguson, supra.*

[7] We note parenthetically the important fact that it would not be sufficient to convict Watson of felony-murder simply by showing that he knew that Clay had a gun. It must be "further shown that [Watson] intentionally assisted [Clay] in the commission of the crime and that he did this, sharing with [Clay] the mental state required for that crime." *Com-*

We consider, therefore, the judge's charge on the felony-murder theory of guilt and particularly his instructions concerning the proof necessary to find Watson guilty on this theory. He said that each defendant would be guilty on the theory of felony-murder if it was proven beyond a reasonable doubt that there was an unlawful killing during the defendants' commission of an armed robbery. Armed robbery, in turn, required, he instructed, proof that (1) "*a* defendant was armed with a dangerous weapon" (emphasis supplied), (2) the defendant assaulted the victim with the intent to steal his property, and (3) the defendant took money or property from the possession of the victim. The judge further instructed on the theory of joint enterprise, including the requirement that a guilty participant must share the specific intent and state of mind of any other guilty participant. He added no instruction that the jury had to find that Watson had knowledge of the gun in order to find him guilty of felony-murder.

If, in some way, this general language about sharing Clay's specific intent might implicitly have told the jury that they had to find Watson knew Clay had a gun (and we think it did not), what next happened dispels any such inference. On the day following the charge, the jury sought further instructions. One of the questions was: "Is it armed robbery if a robbery is committed when one of the participants has a weapon in his possession even though

---

*monwealth* v. *Richards*, 363 Mass. 299, 307-308 (1973). "[I]t would suffice if the purpose to murder in the mind of [Watson] was a conditional or contingent one, a willingness to see the shooting take place should it become necessary to effectuate the robbery or make good an escape." *Id.* at 308. Watson's knowledge that Clay had a gun (and Watson's involvement in the armed robbery in the way in which a jury could find he did participate) would be sufficient to warrant Watson's conviction of murder in the first degree on the theory of felony-murder. *Id.* *Commonwealth* v. *Lussier*, 333 Mass. 83, 94 (1955). It is these additional essential elements warranting a finding of guilt of murder in the first degree that assure that "the circumstances of the felony" will show "that the defendant consciously disregarded risk to human life." *Commonwealth* v. *Moran*, *supra* at 651. Accordingly, it is important to determine initially whether the jury were properly advised that they must find that Watson knew Clay had a gun.

there is no indication the weapon was used in the robbery itself?"[8]    After discussion with counsel, the judge correctly answered the question in the affirmative.  The judge further instructed that the Commonwealth had to prove "the presence of the dangerous weapon in the possession of a person perpetrating the armed robbery."  He did not instruct the jury that, to find Watson guilty of felony-murder, they had to find that Watson knew Clay had a gun.

We recognize that Watson's counsel did not specifically request an instruction concerning proof of Watson's knowledge, nor did he object to the absence of such an instruction. Our cases have indicated the requirement of such knowledge in order to establish accessorial responsibility.  See *Commonwealth v. Ferguson*, 365 Mass. 1, 8 (1974).  The judge's charge, however, instructed the jury explicitly that Watson could be guilty of felony-murder simply if Clay had a gun and implicitly instructed the jury that it did not matter whether Watson knew Clay had a gun.  In the exercise of our obligation under G. L. c. 278, § 33E, we conclude that there was a substantial risk of a miscarriage of justice in the failure to charge the jury that Watson could be guilty of felony-murder, based on armed robbery, only if he had knowledge of Clay's possession of a gun.  There must therefore be a new trial as to the defendant Watson.[9]

---

[8] The jury added this comment: "Our difficulty is where does the robbery stop and the murder begin if, in fact, it can be separated so that a verdict of murder in the first degree or murder in the second degree could be rendered."

[9] Watson makes no argument that the evidence did not warrant a finding that he had knowledge that Clay had a gun.  The jury could infer knowledge from the circumstances.  What Justice Kaplan said for the court in *Commonwealth* v. *Ferguson, supra* at 9, is apt here: "There was no proof of prior discussion or consultation among the actors which often appears in cases of armed robbery or other crimes committed by multiple offenders, and provides a basis for reasoning about the participants' awareness of or intentions with respect to weapons. But there was evidence of a common venture, and a person joining in a robbery under conditions like the present, and apprehending that the intended victim might resist, could suppose that the other actors might be furnished with

4. We consider next Watson's argument that the judge improperly denied his motion for a required finding of not guilty presented at the conclusion of the Commonwealth's case. From what we have said already, it is clear that there was sufficient evidence to warrant a jury finding Watson guilty of murder in the first degree on the theory of felony-murder. Similarly, there was sufficient evidence of malice aforethought, apart from the malice that may be found in the intent to commit a felony (*Commonwealth* v. *Moran,* 387 Mass. 644, 649 [1982]), to warrant a conviction of murder. The more difficult question is whether there was sufficient evidence to warrant a finding beyond a reasonable doubt of deliberate premeditation and thus to warrant Watson's conviction of murder in the first degree on that theory.

We conclude that the jury would have been warranted, based on the facts and reasonable inferences from the facts, in finding that Watson was guilty of deliberately premeditated murder. The jury could have found the following: Watson, Clay, and the unidentified third man agreed to rob a taxicab driver. Watson knew Clay had a gun. Their plan was to enter a taxicab on Washington Street and have it driven to the Archdale Housing Project where they would rob the driver. They did so. At Brookway Terrace, they pulled the victim out of the taxicab. They threatened and beat him. The victim pleaded that they let him live. The victim had reason to believe his life was threatened, inferentially by a gun. Watson heard the victim's plea. Clay went through the victim's pockets, while Watson held the victim

weapons, and in fact . . . [a weapon was] used." See *Commonwealth* v. *Mangula,* 2 Mass. App. Ct. 785, 791 (1975).

On the facts, even if Watson did not know that Clay had a gun and was thus only involved (from his point of view) in an unarmed robbery, the judge would have been warranted in submitting to the jury the question whether, pursuant to the *Matchett* and *Moran* cases, Watson in the circumstances of the unarmed robbery consciously disregarded the risk to human life.

Of course, Clay, who according to the evidence had a gun and used it, is not entitled to the benefit of the rule we apply to Watson.

from behind. Watson released the victim and moved away from him. The victim threw an object which Clay recovered. Clay returned and shot the victim. All three men ran away together. The jury would have been warranted in finding that the three men, in response to the victim's resistance or to prevent their identification, formed an intention to kill the victim or at least recognized that the gun might be used. Thus Watson's involvement was more than that of a "mere onlooker" and, because he could have been found to be an abettor, the evidence was sufficient to warrant a finding that Watson committed deliberately premeditated murder. See *Commonwealth* v. *Soares,* 377 Mass. 461, 471-472, cert. denied, 444 U.S. 881 (1979); *Commonwealth* v. *Rego,* 360 Mass. 385, 391 (1971). Watson could have known that Clay had a gun and intended to use it. *Commonwealth* v. *Soares, supra* at 472. Contrast with the *Soares* case, *Commonwealth* v. *Clark,* 363 Mass. 467, 473 (1973) (convictions of murder in the second degree), where one defendant had no reasonable basis to believe that the other defendant would shoot the victim after an illegal drug transaction was aborted.[10] See *Commonwealth* v. *Casale,* 381 Mass. 167, 172-174 (1980) (convictions of murder in the second degree).

5. Pursuant to our duty to review the case under G. L. c. 278, § 33E, we see no reason to disturb the verdict against Clay. The judgment against Clay is affirmed. The judgment against Watson is reversed, the verdict is set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*

---

[10] Although we conclude that there was sufficient evidence to warrant Watson's conviction of murder with deliberate premeditation, we do not know the theory or theories on which the jury reached their verdict, and, therefore, the error in the instructions of felony-murder requires that there be a new trial.

NOLAN, J. (dissenting with whom Hennessey, C.J., and Lynch, J., join). I dissent. Although the judge did not specifically instruct the jury that they had to find that Watson knew that Clay had a gun, justice does not require a new trial of this case. An eyewitness saw Watson, Clay, and another man pull Boyajian from the taxicab. The same eyewitness saw Watson and the others beat Boyajian after he pleaded for his life. The same eyewitness saw Watson hold Boyajian while Clay went through his pockets. After Clay pumped five bullets into Boyajian's head, the three men ran away. There was a moment in time, apparently just before Clay shot Boyajian, when Watson disappeared from the sight of the witness. The jury had every right to believe, as they evidently did believe, that Watson was present in that fleeting moment.

The court attaches great significance to the jury's request for further instruction. Admittedly, the judge answered the jury correctly. The judge had already correctly charged on the elements of armed robbery. He had already correctly instructed the jury on the law of joint criminal enterprise. He said that the Commonwealth must "prove beyond a reasonable doubt that the person that they allege is guilty on the theory of joint criminal venture with another was actively involved in the participation of the crime that was the object of the venture. That he shared the specific intent to see the successful completion of that crime. And that he actively did something in pursuance of that crime . . . ." This instruction is faithful to our law on joint criminal enterprise. See *Commonwealth* v. *Whitehead*, 379 Mass. 640, 650-652 (1980). It is difficult to understand how the jury could conclude that Watson met these criteria for a joint undertaking if they found that he did not know that Clay had a gun and would use it, if necessary. It is even more difficult to believe on the overwhelming evidence in this case that Watson did not know of the gun.

A judge is not required to "instruct on every subsidiary fact and possible inference." *Commonwealth* v. *Chasson*, 383 Mass. 183, 188 (1981). Further, it was open to Watson

to argue to the jury that he did not know that Clay had a gun.

The requirement demanded by the court today is unreasonable, especially in light of the failure of defense counsel to request such an instruction before the charge and his failure to object to its omission after the charge.