COMMONWEALTH *VS.* HAROLD H., a juvenile.

No. 96-P-1142.

Plymouth. February 12, 1997. - August 7, 1997.

Present: KASS, GREENBERG, & FLANNERY, JJ.

*Delinquent Child. Practice, Criminal,* Juvenile delinquency proceeding, Transfer hearing, Findings by judge. *Evidence,* Juvenile delinquency.

In a juvenile proceeding in which the Commonwealth moved for transfer of the juvenile to Superior Court to be tried as an adult, the matter was remanded for a rehearing to clarify the judge's subsidiary findings and for reconsideration of the judge's decision not to transfer the juvenile. [322-325]

At a rehearing in a juvenile transfer proceeding, the judge should consider, if the evidence is otherwise admissible, testimony from the victim of an armed robbery committed some five months before the incidents in question as relevant to the defendant's propensity to violence and suitability for rehabilitation. [325-326]

The Commonwealth's appeal from the judge's order denying the Commonwealth's motion to transfer a juvenile for trial as an adult was timely. [326]

COMPLAINT received and sworn to in the Brockton Division of the District Court Department on May 26, 1994.

Probable cause and transfer hearings were held in the juvenile session before *David E. Stevens,* J.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

*Stephen H. Merlin* for the juvenile.

GREENBERG, J. A complaint in the juvenile session of the Brockton Division of the District Court Department charged the juvenile with armed assault with intent to murder, assault and battery by means of a dangerous weapon, unlawful carrying of a firearm, and unlawful possession of a firearm. The juvenile was fourteen years old at the time of the incident. Following a prob-

able cause (Part A) hearing, held pursuant to G. L. c. 119, § 61,[1] the judge found that probable cause existed with regard to all four charges. After a three-day transfer (Part B) hearing, the judge denied the Commonwealth's motion to transfer the juvenile to the Superior Court for trial, finding that the juvenile presented "a significant danger to the public, but is amenable to rehabilitation within the juvenile justice system." That portion of the judge's order is the principal ground of the Commonwealth's appeal.[2] We conclude that the judge employed an incorrect standard in determining whether the juvenile was amenable to rehabilitation.

We sketch the judge's findings regarding the operative events. An argument among several youths erupted into violence on Bartlett Street in Brockton on May 25, 1994. The juvenile shot one of his antagonists in the back. Knowing that he had hit the target, but uncertain about the damage done, the juvenile asked, "Is he dead yet?" and fired a second shot that passed through

---

[1]General Laws c. 119, § 61, has been repealed by St. 1996, c. 200, § 8, effective October 1, 1996.

According to G. L. c. 119, § 61, as amended by St. 1990, c. 267, § 3, and as in effect at the time of the hearing, "[t]he Commonwealth [could] request a transfer hearing whenever it [was] alleged in a complaint that a child who [was] fourteen years old or older, [had] committed an offense against a law of the Commonwealth, which, if he were an adult, would be punishable by imprisonment in the state prison, and that the offense . . . involve[d] the threat or infliction of serious bodily harm. . . . If a child is charged with [armed assault with intent to murder], and a finding of probable cause has been made, there shall exist a rebuttable presumption that the child presents a significant danger to the public and that such child is not amenable to rehabilitation within the juvenile justice system."

The existence of probable cause is determined at a hearing known as a "Part A hearing." If probable cause is found, dangerousness and amenability to treatment are determined at a hearing known as a "Part B hearing." *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 219-220 n.2 (1993).

If, as in the instant case, the juvenile is charged with armed assault with intent to murder and a finding of probable cause has been made, § 61 creates a rebuttable presumption that the juvenile is dangerous to the public and not amenable to rehabilitation within the juvenile justice system. After the juvenile presents evidence sufficient to warrant findings of nondangerousness and amenability to rehabilitation, the Commonwealth loses the benefit of the presumption, see *Commonwealth* v. *Wayne W.*, 414 Mass. at 222 n.5, and must prove otherwise by "a preponderance of the evidence." *Commonwealth* v. *O'Brien*, 423 Mass. 841, 845 (1996).

[2]There are subsidiary appellate issues concerning excluded testimony and the timeliness of the appeal. Those we resolve in favor of the Commonwealth.

the victim's chest. Together with others, the juvenile fled the scene. He was apprehended later. The injuries to the victim were severe: he was hospitalized for twenty-two days and underwent three surgical procedures.

At the Part B hearing, which began on March 9, 1995, the Commonwealth presented five witnesses: two case workers from the Department of Youth Services (DYS), two junior high school principals, and Dr. George Hardman, a court-appointed psychiatrist. Except for the psychiatrist, all had had extensive contact with the juvenile prior to the hearing. On the basis of their testimony, the judge found that the juvenile had serious behavioral problems exacerbated by drug and alcohol abuse. The juvenile had been expelled from school on March 1, 1994, because of chronic misbehavior, including armed robbery of another student.

The judge found that the juvenile had not fared well while on probation for the previous adjudication of armed robbery. In addition to his detention by the DYS on the current charges, the juvenile has spent time at several of its other facilities. While awaiting trial, he was involved in five major assaultive episodes which resulted in either transfer to a different facility or temporary suspensions of his normal privileges.

Against this backdrop, Dr. Hardman opined that the juvenile's prognosis for rehabilitation was "guarded" and that, given the seriousness of the charges and the juvenile's lack of anxiety or conflict about them, his amenability to treatment was poor.

Defense witness Dr. Frank DiCataldo, a forensic psychologist, did not entirely share Dr. Hardman's grim view of the juvenile's behavior while in detention, and thought he stood "a better chance of making a successful adjustment postrelease if he is exposed to a number of years of" treatment in a secure DYS facility. He could not say with any degree of certainty that rehabilitation would occur before the juvenile's twenty-first birthday. However, given that the juvenile had not previously participated in any juvenile intervention programs, the doctor expressed mild optimism that he could respond to DYS treatment.

1. *Amenability to rehabilitation.* Of the eight factors listed in G. L. c. 119, § 61, upon which the transfer decision turns, the judge's decision not to transfer the juvenile apparently rested

primarily on the "likelihood of rehabilitation."[3] It is implicit from the judge's findings that all of the other statutory factors, save possibly the "nature of the services available within the juvenile justice system," favored transfer in this case. Although no one factor is controlling, see *Ward* v. *Commonwealth*, 407 Mass. 434, 437 (1990), this case requires a more focused analysis of the juvenile's amenability to rehabilitation. Although a judge has wide discretion in determining whether a juvenile should remain within the juvenile system or be tried as an adult, he must make written findings regarding the juvenile's dangerousness and amenability to rehabilitation. *Commonwealth* v. *O'Brien*, 423 Mass. at 845. On this record, particularly in light of the judge's subsidiary findings that the juvenile did not fare well on probation and that he "lacks self control," serious ambiguity exists.

We do not think, as the Commonwealth argues, that this is a case where there has necessarily been error in the judge's ultimate conclusion that the juvenile is amenable to rehabilitation within the juvenile system. The judge was free to accept the more optimistic opinion of Dr. DiCataldo and reject that of Dr. Hardman. See *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 634, 639 (1985) (faced with conflicting expert opinions, the fact finder may accept one opinion and reject another). There is merit, however, to the Commonwealth's argument that the judge's subsidiary findings are sufficiently flawed so as to require further consideration by the juvenile session. Subsidiary findings are of "vital significance," *A Juvenile* v. *Commonwealth (No. 1)*, 380 Mass. 552, 558 (1980), and the conflict within these subsidiary findings is troubling.

As the court reinforced in *O'Brien*, "[t]reatment is not the same as rehabilitation." 423 Mass. at 846. The court stressed that "our cases have made clear the distinction between rehabilitation and treatment, holding that, while a juvenile can be treated within the juvenile justice system, transfer is still appropriate if the juvenile cannot be rehabilitated within the time that the juvenile can be kept within the juvenile justice system."

---

[3]The other factors are (a) nature, circumstances and seriousness of the alleged offense; (b) the child's court and delinquency record; (c) the child's age and maturity; (d) the child's family, school, and social history; (e) success or failure of any past treatment efforts of the child; (f) nature of the services available within the juvenile justice system; and (g) adequate protection of the public.

*Ibid.* Here, the judge ultimately concluded that the juvenile's *"best bet for treatment* would be within the juvenile justice system, due to his age and lack of prior counselling history" (emphasis added).

We stop short of saying that the judge plainly erred in concluding, as between commitment to the DYS or the Department of Correction (if he were tried as an adult), that better treatment might be available within DYS.[4] To say that his age and lack of exposure to the juvenile system augur well does not, however, answer the question posed by this appeal: Was there a finding that, with treatment, the juvenile would be rehabilitated within the present juvenile structure?

In that respect, the judge's findings are unclear. The rehabilitative ideal is itself a complex of ideas which perhaps defies an exact definition.[5] We can, however, identify one essential point: the effectiveness of measures employed to treat the adjudicated delinquent requires at least a willingness to change troubling behaviors. Here, we have not been furnished with any findings or references regarding the juvenile's ability or inclination to cooperate with DYS treatment modalities. In his written report, Dr. DiCataldo states that the juvenile "seemed to lack an appreciation about the serious nature of [the] evaluation and his situation," and that he could not offer a conclusive opinion based on the psychological data obtained during the course of his evaluation about the juvenile's "ability to benefit from rehabilitation efforts." It appears that the judge relied on Dr. DiCataldo's more favorable testimony and other portions of his written report in concluding that there were some positive signs worthy of consideration.[6]

Dr. DiCataldo outlined five traits which bore on the juvenile's incapacity to accept responsibility for his violent and anti-social

---

[4]In *Commonwealth* v. *Perry P.*, 36 Mass. App. Ct. 914, 915 (1994), a psychologist testified that there were no programs in place to continue therapy in the adult system. However, we observed that "the statute is new, and programs may be developed as juveniles tried under the new statute come of age for transfer to the adult system." *Id.* at 915-916.

[5]Allen, Criminal Justice, Legal Values and the Rehabilitative Ideal, 50 J. Crim. Law, Criminology & Police Science 226 (1959).

[6]For example, the doctor reported that the juvenile "approached the examination process in [*sic*] an open and positive attitude. He appeared to enjoy interacting with the examiner and was cooperative and polite. He was energetic, spontaneous and did not appear defensive, cautious, or guarded. He answered all questions posed to him."

behavior: (1) faulty cognitive beliefs that support aggression; (2) impulsive behavior; (3) inability to generate nonaggressive solutions to interpersonal conflict; (4) low self-esteem; and (5) inability to empathize with subjective feelings of others. While each of these elements viewed separately might not lead us to conclude that the judge abused his discretion by ruling the juvenile was amenable to rehabilitation, see *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 48-49 (1992), together they raise serious doubts, especially when combined with the findings of dangerousness, see *Commonwealth* v. *Costello*, 392 Mass. 393, 397 (1984), and the juvenile's failure to understand the seriousness of his situation.

In light of our decision and the possibility that further evidence may be adduced with relation to the subject matter of this opinion, we think it best to leave the ultimate decision to the judgment of the judge who may preside over any rehearing.

2. *Exclusion of testimony.* The Commonwealth also argues that it was error for the judge to exclude testimony from the victim of a prior armed robbery committed by the juvenile. The judge held a voir dire, at which defense counsel questioned the fairness of allowing the victim of the prior crime to testify. Refusing to allow the testimony, the judge ruled that "[i]t sounds kind of remote to me." The Commonwealth claims that the testimony concerning the juvenile's behavior toward the victim in the earlier case is relevant to prove a propensity toward violent behavior and that the juvenile is not a suitable candidate for rehabilitative effort. Questions of admissibility of evidence must be resolved at a transfer hearing on the basis of fundamental fairness. See *Commonwealth* v. *Watson*, 388 Mass. 536, 540 (1983), citing *McKeiver* v. *Pennsylvania*, 403 U.S. 528, 543 (1971). In this instance, the juvenile's prior offense was not remote in time, as it occurred on January 19, 1994, about five months before the current offenses. See Liacos, Massachusetts Evidence § 4.1.4 (6th ed. 1994). In view of Dr. DiCataldo's opinion, on which the judge relied, testimony about the juvenile's aggressive behavior while engaged in an armed robbery was relevant to the juvenile's dangerousness and amenability to rehabilitation. Dr. DiCataldo testified that the juvenile refused to discuss his version of his involvement in the present case. He stated in his report that "[t]his critical piece of clinical information is vital to an opinion about future violence." In his written report, he emphasized that the severity of the juvenile's

recent violence in the community was of great concern in formulating a prognostic picture. The contested testimony was intended to fill this gap. It was offered to show that the juvenile's impulsive behavior and inability to control aggression against others was so ingrained as to defy intervention by juvenile authorities. Since there are to be further proceedings, we suggest that some of the details of the prior armed robbery be considered, provided the evidence is otherwise admissible.

3. *Timeliness of the notice of appeal.* Finally, the juvenile argues that the Commonwealth's appeal should be dismissed because the notice was filed on May 16, 1995, one day in excess of the ten-day limit imposed by G. L. c. 119, § 61, and G. L. c. 278, § 28E. The juvenile claims that the ten-day period for filing a notice of appeal runs from the date the judge's findings, rulings of law and order were signed, in this case, on May 5, 1995. However, it is uncontroverted that neither party received a copy of the judge's findings, rulings of law and order until May 8, 1995.[7] The May 16, 1995, notice of appeal was therefore timely. Contrast *Commonwealth* v. *Guaba*, 417 Mass. 746, 751 (1994).

The case is remanded to the juvenile session of the Brockton District Court for further proceedings consistent with this opinion. At his discretion, the judge may wish to conduct an evidentiary hearing to consider new information concerning the juvenile's progress while in detention.

*So ordered.*

---

[7] The juvenile's counsel states in his affidavit that he knew on May 5, 1995, from a telephone conversation with the judge's secretary, that the findings, rulings of law and order were ready to be picked up on that day, but that he waited until May 8 to do so. There is no indication that the Commonwealth was aware on May 5 that the judge's decision was ready and available. The fact that the Commonwealth may have been aware prior to May 5 that the judge intended to deny its motion to transfer the juvenile is of no significance because it could not have known without first reading the judge's findings, rulings of law and order whether there was a basis for appeal.