Raymond GAINES

v.

James MATESANZ

No. CIV.A.98–12092–RGS.

United States District Court,
D. Massachusetts.

July 22, 2003.

Maxine Sushelsky, Cambridge, MA, Pro se.

Cathryn A. Neaves, Attorney General's Office, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE*

STEARNS, District Judge.

I agree with Magistrate Judge Dein's analysis, and her ultimate conclusion that despite an obvious slip of the tongue, the reasonable doubt charge taken as a whole did not violate petitioner's due process rights.[1] I also agree that petitioner's remaining complaints about the judge's charge are without constitutional merit. The Magistrate Judge identifies the constitutional test for a challenge based on the sufficiency of the evidence, and fully and accurately explains why petitioner is not entitled to relief. Finally, I agree with the Magistrate Judge that petitioner's appellate counsel was not ineffective. Indeed, to have pursued on appeal the inconsistent argument that petitioner argues should have been advanced would have better lent itself to a claim of ineffectiveness than the reasonable tactical choice counsel made in pursuing the claim of misidentification.

ORDER

For the foregoing reasons, the Recommendation is *ADOPTED*, the petition is *DENIED*, and the case is *DISMISSED*.

SO ORDERED.

*REPORT AND RECOMMENDATION REGARDING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS*

DEIN, United States Magistrate Judge.

*I. INTRODUCTION*

Petitioner, Raymond Gaines ("Petitioner"), a state prisoner serving two life sentences for armed robbery and first degree murder, challenges the constitutionality of his conviction in this habeas corpus petition. Petitioner alleges errors in the trial court's jury instructions and claims ineffective assistance of counsel. His petition has been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons detailed herein, this court recommends that even though the decision in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), should be applied retroactively to this case, the Petition for Writ of Habeas Corpus should be DENIED.

*II. STATEMENT OF FACTS*[1]

*Procedural Background*

---

1. Respondent objects to the Magistrate Judge's determination that *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), should be applied retroactively in petitioner's case. Because the outcome is the same under a pre- or post-*Cage* analysis, the determination is not essential to the ultimate finding, and the correctness of the Magistrate Judge's determination is not material to the result.

1. The Respondent's Appendix ("R.A.") is docketed in this action as Docket # 13. Peti-

tioner's Appendix ("P.A.") is docketed as Docket # 14. Petitioner first filed a "Memorandum of Law in Support of Petition Under 28 U.S.C. Sec. 2254 for a Writ of Habeas Corpus by a Person in State Custody" ("Pet. Mem.") and then filed a "Memorandum of Law Re: Merits of Habeas Corpus Petition" ("Pet. Mem. of Law,"). Both of these are docketed as Docket # 49. "Respondent's Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus" (Docket # 52) will be cited as "Opposition." The "Reply to Respondent's Opposition to Petition for

In May of 1975, Petitioner was indicted for murder in the first degree and armed robbery. *See Commonwealth v. Funderberg,* 374 Mass. 577, 579, 373 N.E.2d 963, 964 (1978). Petitioner's court-appointed counsel withdrew from the case on May 21, 1976. *Id.* New counsel was appointed the same day and trial was scheduled for June 9, 1976. *Id.* at 579, 373 N.E.2d at 964–65. New counsel's motions for a continuance, filed before the June 9, 1976 trial and renewed on June 9, 1976 and thereafter, were denied. *Id.* at 579–80, 373 N.E.2d at 965.

On June 18, 1976, a Massachusetts jury found Petitioner guilty of first degree murder and armed robbery. R.A. Ex. 1 at A.8. Petitioner's motion for a new trial was denied on April 4, 1977. *Id.* at A.17. The Massachusetts Supreme Judicial Court ("SJC") affirmed Petitioner's conviction on both counts on March 6, 1978. *Commonwealth v. Funderberg,* 374 Mass. at 578, 373 N.E.2d at 964.

Nearly twenty years later, on April 25, 1995, Petitioner moved *pro se* both for a new trial and appointment of counsel. *See* Report and Recommendation Regarding Respondent's Motion to Dismiss (Docket # 38) at 2. On June 13, 1995, a Superior Court judge denied the motion for a new trial. *Id.* In response, Petitioner filed a *pro se* application to the SJC for leave to appeal and renewed his motion for appointment of counsel. *Id.* Counsel was appointed and filed supplemental memoranda. *Id.* On October 20, 1997, a gatekeeper justice of the SJC denied further review of Petitioner's claim, concluding that Petitioner's claims lacked merit and

did not raise any new or substantial questions, as required under Mass. Gen. Laws ch. 278, § 33E. *Id.* at 2, 16–17.

Petitioner filed the current two count petition for a writ of habeas corpus on September 28, 1997. *Id.* at 3. Respondent, James Matesanz ("Respondent"), Superintendent of the Bay State Correctional Center, moved to dismiss, claiming that Petitioner's claims were procedurally defaulted and that Petitioner had failed to exhaust his state remedies. *Id.* at 3–4. On July 10, 2001, District Judge Stearns denied Respondent's motion to dismiss, adopting the Report and Recommendation of Magistrate Judge Neiman. *See* District Court Order (Docket # 42). The court found that Petitioner had fairly presented all of his claims to the state system, thereby exhausting his state remedies. *See* Report and Recommendation (Docket # 38) at 14. The court further concluded that the SJC gatekeeper's denial of the second motion for a new trial was based on the merits of the case which removed any procedural bar. Report and Recommendation at 16–17; District Court Order at 2.

### Underlying Facts

The following facts, taken from the SJC's decision in *Commonwealth v. Funderberg,* are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *see also Coombs v. Maine,* 202 F.3d 14, 18 (1st Cir.2000).

At approximately 4:00 p.m. on Tuesday, December 10, 1974, Petitioner and two other defendants, Anderson and Funderburg, entered a shoe repair store in Rox-

a Writ of Habeas Corpus" (Docket # 53) will be referred to as "Pet. Reply." This court required further briefing on the Petitioner's second ground, *i.e.,* the sufficiency of the evidence relating to his knowledge of his co-defendants' possession of weapons. On April 7, 2003, the Petitioner filed a "Supplemental Memorandum Re: Merits of Habeas Corpus

Petition" (Docket # 57), referred to as "Pet. Supp. Mem.". On April 10, 2003, the Respondent filed a "Supplemental Memorandum in Opposition to Petition Seeking a Writ of Habeas Corpus" (Docket # 58), cited as "Supp. Opposition". The entire transcript ("Tr.") has been filed as Docket # 56.

bury, Massachusetts. *Commonwealth v. Funderberg,* 374 Mass. at 578, 373 N.E.2d at 964. Petitioner took money from the cash register, which the store owner's fifteen-year-old son was tending at the time. *Id.* Both Anderson and Funderburg were carrying guns and one of the men fatally shot the store owner before the three men backed out of the store. *Id.*[2]

The three men ran to an apartment in a nearby housing project, which was used as a "shooting gallery" by heroin users, sometime after 4:00 p.m. *Id.* Funderburg, with a gun in his belt, said, "When we get ready to do something and you get in the line of fire, you get hurt, too." *Id.* One of the men asked, "How much money did we get?" The answer was $120. *Id.* at 578–79, 373 N.E.2d at 964. Then one man instructed the others to "go back in the back room to do what we intended to do." *Id.* at 579, 373 N.E.2d at 964.

Gaines, Anderson and Funderburg were in the back room when the police knocked on the door to the apartment, were admitted, and entered the apartment. *Id.* The police left when the proprietor of the "shooting gallery" asked for a search warrant. *Id.* The proprietor testified that several days later "Funderburg was telling Anderson that he thought he'd hit him (the victim), you know, and Anderson said he don't think his shot hit him." *Id.*

In May of 1975, police obtained arrest warrants for Petitioner and three police officers traveled to Des Moines, Iowa, where Gaines was in custody, to bring him back to Boston. *Id.* Petitioner was given *Miranda* warnings by one officer, yet, on the return flight he told another officer that since that officer had not warned him of his rights, he could tell that officer the story. He told the officer that "he was there when it happened, when it went

down. He told [the officer] that the boy would never be able to recognize him because he pulled his hat down on his forehead and he took out his teeth." *Id.*

At trial, Petitioner disputed the identification made by the victim's son, and presented alibi testimony that he had left Boston on a bus for Iowa on December 8, 1974 and had telephoned his aunt upon arriving in Iowa on December 10, 1974. *Id.*

### III. STANDARD OF REVIEW

Although Petitioner's conviction occurred in 1976, because his federal habeas corpus petition was not filed until after April 1, 1996, it is governed by the federal habeas statute, 28 U.S.C. § 2254, as amended by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997). The statute provides:

(d) an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted with any respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .

28 U.S.C. § 2254(d).

A review under 28 U.S.C. § 2254 first requires a federal court to determine whether there was "clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court conviction became fi-

---

**2.** The facts relating to the shooting are discussed in detail below in connection with the

"joint venture" discussion.

nal. *Williams v. Taylor*, 529 U.S. 362, 379–80, 120 S.Ct. 1495, 1505–06, 146 L.Ed.2d 389 (2000). Relief may be granted if the state court decision was "contrary to, or involved an unreasonable application of" such clearly established Federal law. *Id.* at 384, 120 S.Ct. at 1508. Basically, the AEDPA "directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody ... violates the Constitution, that independent judgment should prevail." *Id.* at 389, 120 S.Ct. at 1511. Finally, where, as here, the state court (in its consideration of Petitioner's Motion for New Trial) does not explain its decision in any detail, "an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.2000), and cases cited. *Cf. Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir.2001) (where state court did not decide the federal issue presented, federal court reviewed the issue *de novo* ).

## IV. ANALYSIS [3]

The Petitioner has raised two grounds in support of his habeas petition: alleged errors in the trial court's jury instructions and ineffective assistance of counsel. For the reasons detailed herein, this court recommends that the Petition for a writ of habeas corpus be denied.

**3.** Respondent continues to urge this court to rule that Petitioner's two grounds for habeas relief are procedurally defaulted. *See* Opposition at 7; Supp. Opposition at 2, n. 1. This argument was previously rejected in this case in connection with the denial of the motion to

### A. Jury Instructions

Gaines claims that the trial court's reasonable doubt jury instructions were constitutionally deficient, as they shifted the burden of proof from the Commonwealth to Petitioner. Petitioner buttresses this argument by claiming that additional erroneous instructions were given, including those regarding alibi, identification, consciousness of guilt, and presumption of innocence. He contends that these alleged errors, in totality, violated his due process rights.

■ It is (and was in 1978, at the time of Petitioner's conviction) an established principal of Federal law that "the Due Process Clause requires the State in criminal prosecutions to prove guilt beyond a reasonable doubt." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973) (citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Since it was decided in 1970, *In re Winship* has "provided the basis for attacks on jury instructions that lessen the government's burden of proof." *Simpson v. Matesanz*, 175 F.3d 200, 213 (1st Cir. 1999). Thus, a jury instruction that "places an improper burden on the defense and allows the jury to convict despite its failure to find guilt beyond a reasonable doubt" violates a defendant's constitutional rights. *Cool v. United States*, 409 U.S. 100, 102–03, 93 S.Ct. 354, 356, 34 L.Ed.2d 335 (1972).

■ In 1990, the United States Supreme Court decided *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), wherein a reasonable doubt jury instruction was found unconstitutional for

dismiss. The decisions of the Magistrate Judge and the District Judge in this case finding that the Petitioner's claims have not been procedurally defaulted are adopted by this court, and the issue of procedural default will not be addressed herein.

the first time. The jury instruction in *Cage* "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty." *Id.* at 41, 111 S.Ct. at 329. The Court concluded that such language suggests "a higher degree of doubt than is required for acquittal under the reasonable-doubt standard [established in *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) ]. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id.* at 41, 111 S.Ct. at 329–30. Thus, under *Cage*, as clarified by *Estelle v. McGuire*, 502 U.S. 62, 72 & n. 4, 112 S.Ct. 475, 482 & n. 4, 116 L.Ed.2d 385 (1991), and *Victor v. Nebraska*, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), "a jury instruction is unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow conviction without proof beyond a reasonable doubt." *Tyler v. Cain*, 533 U.S. 656, 658, 121 S.Ct. 2478, 2480, 150 L.Ed.2d 632 (2001).

Petitioner contends that *Cage* should be applied retroactively to his petition for habeas relief, while the Respondent contends that it cannot be applied to Petitioner's 1978 conviction. In *Tyler v. Cain*, the Supreme Court left open the question whether *Cage* should be applied retroactively to cases on collateral review. 533 U.S. at 666, 121 S.Ct. at 2484. This issue has not been decided in this Circuit. Thus, before addressing the merits of Petitioner's objection to the charge, this court must decide whether *Cage* applies retroactively. This court concludes that it does.

### 1. *Retroactive Application of Cage*

It is universally recognized that *Cage* announced a "new rule of constitutional law." *See Tyler v. Cain*, 533 U.S. at 662, 121 S.Ct. at 2482. Such a new rule cannot be applied retroactively, unless it fits within two narrow exceptions defined in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). As the *Teague* court held:

> First, a new rule should be applied retroactively if it places certain primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. Second, a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty.

*Id.* at 307, 109 S.Ct. at 1073 (internal citations and quotation marks omitted). In *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Supreme Court held that a jury charge which gives a "misdescription of the burden of proof vitiates *all* the jury's findings" since it precludes a finding of guilt beyond a reasonable doubt. *Id.* at 281, 113 S.Ct. at 2082. The Court went on to hold that an improper jury instruction which allows for conviction on a standard less than beyond a reasonable doubt "amounts to structural error, and thus cannot be harmless regardless of how overwhelming the evidence of [the defendant's] guilt." *Id.* at 282, 113 S.Ct. at 2083 (Rehnquist, C.J., concurring). Based on *Sullivan*, a number of Circuit Courts have concluded that errors in reasonable doubt instructions come within the second prong of *Teague*, and *Cage*, therefore, should be applied retroactively. *See Williams v. Kyler*, No. CIV.A. 02–1255, 2002 WL 31662297, at *6 (E.D.Pa. Nov. 19, 2002), and cases cited. *See also Simpson v. Matesanz*, 29 F.Supp.2d 11, 17 (D.Mass.1998), and cases cited, *reversed on*

*other grounds,* 175 F.3d 200 (1st Cir.1999). This court agrees. That a jury must find a defendant's guilt beyond a reasonable doubt, and must not be diverted from such a finding by an incorrect jury instruction, in this court's opinion, qualifies as a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Tyler v. Cain,* 533 U.S. at 665, 121 S.Ct. at 2483–84 (quoting *Graham v. Collins,* 506 U.S. 461, 478, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993)). A "constitutionally deficient reasonable doubt instruction violates the Due Process Clause" and, therefore, satisfies *Teague's* second exception and should be applied retroactively. *See Adams v. Aiken,* 41 F.3d 175, 178–79 (4th Cir.1994).

The inquiry, however, does not end here. Rather, a decision must be made as to whether under the AEDPA the Supreme Court must decide whether the new rule of constitutional law may be applied retroactively before the new rule can be considered in connection with a habeas petition, or whether that determination can be made by a lower court.

In *Tyler v. Cain,* the Supreme Court held that *Cage* could not be applied retroactively to a *successive* habeas petition under § 2244(b)(2)(A) of the AEDPA, which excepts from a ban on successive filings petitions that rely "on a new rule of constitutional law, *made retroactive to cases on collateral review by the Supreme Court,* that was previously unavailable." (Emphasis added). The Court held that the Supreme Court itself, and not any lower court, must have made the new rule retroactive in order for it to be applicable to successive petitions. 533 U.S. at 662–63, 121 S.Ct. at 2482, 150 L.Ed.2d 632. The Court further ruled that it had not made *Cage* retroactive to collateral review, and it refused to opine whether it would do so in the future. *Id.* at 666–68, 121 S.Ct. at 2484–85.

■ The instant case involves an original habeas petition, and not a successive petition. Therefore, § 2244(b)(2)(A), the basis of the ruling in *Tyler,* has no application to the instant case. Rather, the relevant provision is § 2244(d)(1)(C) which provides:

> A 1–year period of limitation shall apply to [an initial petition] under this Section. The limitation period shall fun from the latest of— . . .
>
> (C) the date on which the right asserted was initially recognized by the Supreme Court, *if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases* on collateral review[.]

(Emphasis added). This difference in language leads to the conclusion that the lower courts may make the decision as to whether a new rule is to be applied retroactively. As the court held in *Murray v. United States,* No. CIV.A. 01–11271–WGY, 2002 WL 982389 (D.Mass. May 10, 2002), addressing whether *Apprendi* will be applied retroactively on collateral review:

> With respect to second or successive petitions, Congress explicitly reserved for the Supreme Court the power to make a rule retroactively applicable to cases on collateral review. No such explicit reservation is found in the provision governing initial petitions. The Court assumes that the decision of Congress to use different language with respect to initial petitions vis-à-vis second or successive petitions was deliberate, and that, had Congress intended to allow only the Supreme Court to announce new rules of constitutional law to be retroactively applicable on initial petitions, it would have used the same clear language it used with respect to second or successive petitions.

*Id.* at *2. A number of other courts have reached the same conclusion. *See, e.g.,*

*Ashley v. United States*, 266 F.3d 671, 674 (7th Cir.2001); *United States v. Lopez*, 248 F.3d 427, 432 (5th Cir.2001); *United States v. Sanders*, 247 F.3d 139, 146 n. 4 (4th Cir.2001); *Williams v. Kyler*, No. CIV.A. 02–1255, 2002 WL 31662297, at *3–5 (E.D.Pa. Nov. 19, 2002). *See also Simpson v. Matesanz*, 29 F.Supp.2d at 17 n. 7 ("it would be a completely unnatural reading of the statute to hold that the Supreme Court has to make a rule retroactive for first petitions ..."), *reversed on other grounds*, 175 F.3d 200 (1st Cir. 1999).[4] Thus, this court concludes that *Cage* should be applied retroactively to Petitioner's claim. Nevertheless, this court finds that the reasonable doubt charge, as given, was not constitutionally deficient.

## 2. *The Gaines' Reasonable Doubt Charge*

■ "As a general rule, improper jury instructions will not form the basis for federal habeas corpus relief." *Niziolek v. Ashe*, 694 F.2d 282, 290 (1st Cir.1982). The question presented to the federal court is whether the challenged jury instructions violated the petitioner's constitutional rights. *Id.* "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. at 146, 94 S.Ct. at 400).

■ In the instant case, the Petitioner takes exception to the reasonable doubt instruction, and then claims that additional instructions, which will be discussed *infra*, compounded the error. The trial court's

instruction on reasonable doubt was as follows:

> Under our law a defendant is presumed to be innocent. That means that the fact that a defendant has been arrested, the fact that an indictment has been brought against him by the Grand Jury is no evidence of his guilt. That's simply the manner by which a case is brought to this court for trial.

> The presumption of innocence also means that there is no obligation or burden upon a defendant in a criminal case to prove or to establish his innocence. That burden does not rest upon him....

> It is the obligation of the Commonwealth in a criminal case to establish the guilt of a defendant beyond a reasonable doubt. You've heard that phrase used several times during the course of the arguments which have been made here. Proof beyond a reasonable doubt does not mean proof beyond all doubt. It does not mean proof beyond the possibility of innocence. It is rarely if ever possible to find a case so clear that there cannot be the possibility of innocence. If a reasonable doubt or a mere possibility of innocence were sufficient to prevent a conviction, few if any defendants could ever be found guilty of any crime. A foolish doubt, a whimsical doubt, a fanciful doubt is not a reasonable doubt. A reasonable doubt does not mean such doubt as may exist in the mind of a juror who is simply seeking an excuse to give a defendant a break or to acquit him. But a reasonable doubt is one which remains in the mind of a reason-

---

4. There are cases which hold to the contrary. For example, in *Cockerham v. Cain*, 283 F.3d 657, 660 (5th Cir.2002), the court held that the Supreme Court must determine that the law is to apply retroactively. In so ruling, however, the court simply ignored its earlier decision in *United States v. Lopez*, 248 F.3d 427, 432 (5th Cir.2001), which rejected that conclusion. Despite its ruling that *Cage* could not be applied retroactively, the *Cockerham* court did apply *Cage* as the conviction at issue had not become final until after *Cage*.

able juror who is earnestly seeking the truth. That's the job of the jury—To earnestly seek the truth.

A reasonable doubt is one which prevents the jury from reaching that degree of certainty which satisfies the judgment and the consciences of the jurors as reasonable men and women. A reasonable doubt is one which prevents jurors, as reasonable men and women, from reaching a clear and settled conviction of guilt. If that doubt exists as to the guilt of these defendants, or either one of them, they are entitled to that doubt, and they are entitled to be acquitted. On the other hand, that does not mean in any sense of the word that it is the obligation of the Commonwealth to prove the guilt of these defendants to a mathematical certainty, to an absolute certainty, to the extent that two and two make four. That's not the burden of the Commonwealth.

Guilt is established when the evidence is such that it reaches that degree of certainty which satisfies your judgment and your consciences as reasonable men and women.

In determining whether or not the Commonwealth has established the charges against these defendants beyond a reasonable doubt, you must consider and weigh the testimony of all the witnesses who have appeared before you.

R.A. Ex. 10 at 919–922. For the reasons detailed herein, this court concludes that this charge comports with the requirements of Due Process.

The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course .... Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, ... the Consti-

tution does not require that any particular form of words be used in advising the jury of the government's burden of proof .... Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury. *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (internal citations and punctuation omitted). In *Cage*, the Court found use of the phrases "grave uncertainty" and "substantial doubt" when combined with the requirement of a "moral certainty" resulted in an unconstitutional charge. *Cage v. Louisiana*, 498 U.S. at 40–41, 111 S.Ct. at 329. In *Victor v. Nebraska*, the Court made it clear that the use of the words "moral evidence" or "moral certainty" alone did not render a charge unconstitutional. *See Victor v. Nebraska*, 511 U.S. at 14–15, 114 S.Ct. at 1247–48. Such language "cannot be sequestered from its surrounding." *Id.* at 16, 114 S.Ct. at 1248. Rather, the issue presented is whether the language used "impress[ed] upon the factfinder the need to reach a subjective state of near certitude of guilt of the accused." *Id.* at 15, 114 S.Ct. at 1247 (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979)). In the case presently before this court, the language used does meet such a standard.

The charge given did not use the phrases found inappropriate in *Cage*. Thus, there was no mention of "moral certainty," "grave uncertainty" or "substantial doubt." Therefore, even the retroactive application of *Cage* does not help the Petitioner.

Many of the phrases used by the *Gaines* court have been approved by the Supreme Court. For example, the *Gaines* court charged that a "foolish doubt, a whimsical doubt, a fanciful doubt is not a reasonable doubt." In *Victor v. Nebraska*, the Court expressly held that a "fanciful doubt is not a reasonable doubt." 511 U.S. at 17, 114

S.Ct. at 1248. In *Victor v. Nebraska,* the Court approved a charge that "[a] reasonable doubt is an actual and substantial doubt . . . as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." 511 U.S. at 20, 114 S.Ct. at 1250. Similarly, the *Gaines* charge rejected the concept that reasonable doubt may arise from the "possibility of innocence."

The language used by the *Gaines* court was the functional equivalent of reasonable doubt being "a doubt that would cause a reasonable person to hesitate to act," a "formulation [the Supreme Court has] repeatedly approved," and of it being "an abiding conviction as to guilt, without reference to moral certainty" which is an accurate statement of the government's burden of proof. *Victor v. Nebraska,* 511 U.S. at 14–15, 20, 114 S.Ct. at 1247, 1250 (citation omitted). Thus, Petitioner's charge to the jury was that "a reasonable doubt is one which remains in the mind of a reasonable juror who is earnestly seeking the truth,"[5] "[a] reasonable doubt is one which prevents the jury from reaching that degree of certainty which satisfies the judgment and the consciences of the jurors as reasonable men and women. A reasonable doubt is one which prevents jurors, as reasonable men and women, from reaching a clear and settled conviction of guilt." Overall, there was "no reasonable likelihood that the jurors who determined [petitioner's] guilt applied the instructions in a way that violated the Constitution" and convicted "on a lesser showing than due process requires." *Victor v. Nebraska,* 511 U.S. at 22, 114 S.Ct. at 1251.

■ It is undeniable that the Petitioner's charge did contain one slip, a misstatement of the law. The judge did charge that "[i]f a reasonable doubt or a mere possibility of innocence were sufficient to prevent a conviction, few if any defendants could ever be found guilty of any crime." However, this slip of the tongue was preceded by the clear statement that the Commonwealth must "establish the guilt of a defendant beyond a reasonable doubt." It was followed by the clear and repeated statement that a reasonable doubt must lead to the defendant's acquittal (if a reasonable "doubt exists as to the guilt of these defendants, or either one of them, they are entitled to that doubt, and they are entitled to be acquitted"). The judge went on to explain that in determining "whether or not the Commonwealth has established the charges against these defendants beyond a reasonable doubt," the jury must look at all the testimony. Later on in the charge, the judge repeatedly instructed the jury with respect to the specific crimes at issue that the Commonwealth must prove certain facts beyond a reasonable doubt or the Petitioner must be acquitted. *See, e.g.,* R.A. Ex. 10 at 934–39. These "numerous reminders that the jury had a duty to acquit upon the 'failure of the Commonwealth to establish beyond a reasonable doubt any essential element necessary to sustain a conviction of the crimes'" further validates the charge as given. *Bumpus v. Gunter,* 635 F.2d 907, 911 (1st Cir.1980). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v.*

**5.** In *United States v. Gonzalez–Balderas,* 11 F.3d 1218, 1223 (5th Cir.1994), the court cautioned against the use of "seeking of truth" language to define reasonable doubt, since it may imply the balancing of which sides version of events is true and the application of a preponderance of the evidence standard. However, here, as in *Gonzalez–Balderas,* there were clear references to the government's burden of proof beyond a reasonable doubt and, therefore, no likelihood that the wrong standard would be applied. *Id.*

*McGuire,* 502 U.S. at 72, 112 S.Ct. at 482 (citation omitted). The charge, taken as a whole, did not violate the defendant's due process rights, and his petition for habeas relief should be denied.

### 3. *Other Parts of the Charge*

In further support of his objections to the reasonable doubt charge, Petitioner points to other alleged errors in the charge.[6] Since, as detailed above, the reasonable doubt charge as given was acceptable, these additional claims do not add to Petitioner's claim. Moreover, a brief review of these claims establishes that they are without merit.

#### a. *Alibi and Identification Charge*

■ Petitioner challenges the charge on identification and alibi for allegedly failing to include language "that it was the Commonwealth's burden to prove identity and to prove Mr. Gaines' presence in the shoe shop, beyond a reasonable doubt." Pet. Mem. at 18. The trial judge did expressly charge that the jury "must be satisfied beyond a reasonable doubt" that "Gaines was in that shoe shop participating in the robbery" or they must acquit him. R.A. Ex. 10 at 927. After reviewing the evidence relating to the defendant's alibi, he again reiterated that if "reasonable doubt exists" as to his presence in the shoe shop, the jury should "go no further" and must acquit Gaines. R.A. Ex. 10 at 938–39. The charge in these sections did not specifically identify which party had the burden of proof, but it certainly did not shift the burden to the defendant. The jury had been previously charged that "[i]t is the obligation of the Commonwealth in a criminal case to establish the guilt of a defendant beyond a reasonable doubt." *Id.* at 920. They could not have failed to understand that the Commonwealth had

the burden, beyond a reasonable doubt, on the issue of whether the defendant committed the crime. There was no error. *See Commonwealth v. Leaster,* 362 Mass. 407, 416–17, 287 N.E.2d 122, 128 (1972) (conviction affirmed where the instructions "cannot be read to shift any onus of proof to the accused" and there was "no reasonable likelihood that the charge taken as a whole could have lead the jury to ignore the reasonable doubt test") (internal citations omitted).

#### b. *Consciousness of Guilt*

■ The trial judge's charge referred to the Petitioner leaving the apartment through a window when the police came and his departure to Iowa as possible evidence of flight which "may or may not" be considered as evidence or consciousness of guilt. R.A. Ex. 10 at 935–36, 939. Petitioner objects to the failure to warn the jury that they could not convict on consciousness of guilt alone. *See* Pet. Mem. at 17–18. As an initial matter, even if this was an error, it does not rise to the level of a constitutional violation and there are no Supreme Court decisions requiring such an instruction. Moreover, the trial judge expressly instructed the jury that the Commonwealth had the burden of establishing the defendant's guilt beyond a reasonable doubt, R.A. Ex. 10 at 920, and then went through all the elements which had to be established. The judge further instructed on different factual scenarios which the jury could find, including those favorable to the Petitioner, and repeatedly referred to different facts as possibly being "some evidence of guilt" or similar words. *See, e.g., id.* at 934, 935, 937–39. No reasonable juror could have understood

---

**6.** The court has already ruled that these are not independent claims for habeas relief but, rather, are only offered in support of the claim based on the reasonable doubt instruction. *See* Report and Recommendation at 9–10.

that consciousness of guilt, alone, was enough to convict Petitioner.

Finally, it was not until four years after Petitioner's conviction that the Massachusetts Supreme Judicial Court fully addressed the issue of an "evidence of flight" charge. *See Commonwealth v. Toney*, 385 Mass. 575, 584, 433 N.E.2d 425, 431 (1982). There, the court held (in language which has not been made retroactive to previously decided cases):

> We think that a judge should instruct the jury (1) that they are not to convict a defendant on the basis of evidence of flight or concealment alone ... and (2) that *they may, but need not, consider such evidence as one of the factors tending to prove the guilt of the defendant.* We do not think it necessary, as suggested by the defendant, that the judge bring to the attention of the jury the defendant's own innocent explanation for the alleged flight, although the judge may in his discretion do so. *A general instruction of this the type outlined above will suffice.*

*Id.* at 585, 433 N.E.2d at 432 (internal citation omitted; emphasis added). The instructions given in Gaines' case conveyed the general information suggested by *Toney,* and "adequately cautioned the jury concerning the equivocal nature of evidence of flight." *Id.* Therefore, Petitioner's objection to the charge relating to consciousness of guilt fails.

### c. *Presumption of Innocence*

■ Petitioner argues that the trial judge erred in failing to instruct the jury that "the presumption of innocence continues throughout the entire case." Pet. Mem. of Law at 6. Again, Petitioner does not and cannot contend that if the charge was in error on this point it rose to the level of a constitutional violation, and he has cited no Supreme Court law establish-

ing this principle. Moreover, there was no error in the instruction as given which provided that the "defendant is presumed to be innocent," which means that the fact that a defendant has been arrested or indicted by a grand jury "is no evidence of his guilt." R.A. Ex. 10 at 919. It "also means that there is no obligation or burden upon a defendant in a criminal case to prove or establish his innocence." *Id.* at 920. As the Massachusetts Supreme Judicial Court held in *Commonwealth v. Boyd,* 367 Mass. 169, 326 N.E.2d 320 (1975), the function of the presumption "is to emphasize to the jury that 'the finding of an indictment by the grand jury ... [is] not to be regarded as ... [a circumstance] tending to criminate the defendant or creating against him unfavorable impressions, and that he is not to be found guilty upon suspicion or conjecture but only upon evidence produced in court.'" *Id.* at 188, 326 N.E.2d at 332 (citations omitted, punctuation in original). In the instant case, as in *Boyd,* "[t]hat point was fully amplified in the judge's instructions and nothing more is required." *Id.*

### d. *Prior Bad Acts, Prior Convictions and Closing Arguments*

■ Petitioner argues that the Commonwealth's burden of proof beyond a reasonable doubt was further eroded by various questions and arguments made by the prosecutor during the trial and his closing. Again, however, many of these complaints are without merit, and they do not rise to the level of a constitutional violation.[7]

During cross-examination of the Petitioner, the Commonwealth referred to Gaines' prior convictions for breaking and entering and assault with intent to commit armed robbery, and Petitioner claims that it was an abuse of discretion to have allowed that testimony. *See* Pet. Mem. at

---

7. There were no objections made during trial.

14–15. However, Gaines does not contend that the admission of such testimony was prohibited by Massachusetts law. *See* Mass. Gen. Laws ch. 233, § 21 ("proof of conviction of crime to affect credibility"). Moreover, the trial judge properly instructed the jury that the prior conviction had been admitted "for a very, very limited purpose," that it "is not evidence that he perpetrated the crime for which he's on trial here," and that it was up to the jury to decide whether or not knowing of the prior criminal record weakened "the believability, the credibility of the testimony which [Gaines] gave you on the stand." R.A. Ex. 10 at 924–25.

■ "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000); *Commonwealth v. Pope*, 406 Mass. 581, 588, 549 N.E.2d 1120, 1125 (1990). There is no reason to believe that it did not do so in the instant case. Given the proper limiting instruction, it is clear that there was no violation of the defendant's constitutional rights by the admission of his prior conviction.

■ Petitioner also objects to the fact that a witness testified that, on another occasion, he had entered her apartment brandishing a gun. *See* Pet. Mem. at 15. The trial judge immediately struck the testimony and instructed the jury "to disregard both the question and the answer in you deliberations." *Id.* Opposition at 23. This was repeated in the jury charge where the trial judge made it clear "that if after a question was asked and an answer was given by the witness and the Court ruled that the answer should be stricken, you are to disregard both the question and the answer in your deliberations." R.A. Ex. 10 at 919. As detailed above, juries are presumed to follow the instructions given to them by the court. There was no constitutional violation due to the witness' stricken testimony.

■ Finally, Petitioner raises various objections to the Commonwealth's closing. Specifically, Gaines claims that the prosecution sought sympathy for the victims, telling the jury that "the victims in this case had rights too." Pet. Mem. at 15–16. He also presented evidence of a statement allegedly made by Gaines to the police as substantive evidence, when it had been admitted only on the issue of the defendant's credibility. *Id.* at 16–17. Finally, the prosecutor asked why the defendant had not produced a bus ticket which would have exculpated him. *Id.* at 17. In sum, Gaines argues, "these errors were substantial and contributed to the erosion of the concept of the Commonwealth's burden of proof beyond a reasonable doubt as it was presented to the jury." *Id.*

■ In reviewing a prosecutor's closing, it "'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' ... The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' ... Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

The objections raised by the Petitioner do not rise to the level of a due process violation. The trial judge reviewed the factual and legal findings which the jury must make in order to convict Gaines in some detail, thereby obviating any errors in the prosecutor's argument. *See* R.A. Ex. 10 at 926–27, 934–35, 937–39, 942–44. The judge expressly instructed the jury that it was their memory of the facts which controlled, *e.g., id.* at 917–18, and he expressly instructed the jury that the police

testimony was admitted solely on the issue of Gaines' credibility. *Id.* at 937–38.

As the cases cited by Gaines himself establish, it is not clear that the prosecutor's arguments were improper, but it is clear that even if improper, a new trial was not required. For example, with respect to the prosecutor's comment on the defendant's failure to produce a bus ticket, the court in *Commonwealth v. Bryer*, 398 Mass. 9, 494 N.E.2d 1335 (1986), relied on by the defendant, held that in taking the stand, "the defendant opened the issue of his credibility and was subject to scrutiny on that ground." *Id.* at 12, 494 N.E.2d at 1337. Thus, while care must be taken not to shift the burden of proof to the defendant, it may be proper for the prosecution to comment on the defendant's failure to adduce evidence on his behalf. *Id.* at 12–13, 494 N.E.2d at 1337–38. Moreover, any problem with the argument was not of constitutional proportion. Similarly, while a prosecutor should not suggest "that a jury has a duty to decide one way or the other" and should not give an argument "designed to stir passion," an "isolated" remark that was "not part of a recurring theme" does not rise to a level of severe misconduct. *United States v. Mandelbaum*, 803 F.2d 42, 44–45 (1st Cir.1986). In *Mandelbaum*, cited by the defendant, as in the instant case, there is "no reason to believe" that the prosecutor's comments "would affect the jurors in such a way that they would be unable to appraise the evidence in a fair and objective manner." *Id.* at 45. In sum, the Petitioner's objections to the prosecution's closing do not further his claim that the government improperly shifted the burden to him, nor did it allow a conviction on a lesser standard than beyond a reasonable doubt. For these reasons, the petition should be denied.

### B. *Joint Venture*

Petitioner contends that he was denied the effective assistance of counsel because counsel failed to challenge the sufficiency of the evidence to support a finding of joint venture/felony murder. Specifically, Gaines contends that there is insufficient evidence to establish that he knew his co-defendants were armed. Pet. Mem. at 23–25. In addition, he claims that it was ineffective assistance of counsel for his attorney to fail to challenge the jury instructions on the issue of joint venture on appeal. *Id.* at 20–22. For the reasons detailed herein, this court finds that there was sufficient evidence to support the defendant's conviction for armed robbery and felony murder. While the jury instructions were not complete, the defendant was not deprived of his constitutional right to a fair trial and defense counsel's conduct did not rise to the level of ineffective assistance of counsel.

### 1. *Sufficiency of Evidence*

 *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), defines the standard for reviewing habeas challenges contesting the sufficiency of evidence. "Under *Jackson*, a state conviction must be reversed if, after reviewing the evidence in the light most favorable to the prosecution, a court finds that no rational trier of fact could have found, beyond a reasonable doubt, sufficient evidence of the crime for which the defendant was convicted." *Joseph v. Fair*, 763 F.2d 9, 10 (1st Cir.1985). Moreover, as the First Circuit cautioned in *Hurtado v. Tucker*, 245 F.3d 7 (1st Cir.2001):

> As a general rule, federal courts should be particularly cautious about issuing habeas, on grounds of the objective unreasonableness of a state court's conclusion that the evidence is sufficient, where there has been a verdict of guilty by a jury of a defendant's peers, where the defendant's credibility was evaluated by the jury hearing his testimony, where that verdict has been affirmed on appeal

in the state system, and where there is no claim of constitutional error in the conduct of the trial. Even on direct appeal, claims that evidence was insufficient to support the verdict are "often made, but rarely successful."

*Id.* at 19–20. (quoting *United States v. Moran,* 984 F.2d 1299, 1300 (1st Cir.1993)).

 The parties agree that where, as here, "a defendant is charged as an aider or abettor of an aggravated robbery, requiring proof of the use of a dangerous weapon, 'the [g]overnment must show that the accomplice knew a dangerous weapon would be used or at least that he was on notice of the likelihood of its use.'" *Commonwealth v. Avery,* 44 Mass.App.Ct. 781, 783, 694 N.E.2d 40, 42 (1998), and cases cited (quoting *United States v. Sanborn,* 563 F.2d 488, 491 (1st Cir.1977)). "A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at trial .... The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable." *Commonwealth v. Stewart,* 411 Mass. 345, 350, 582 N.E.2d 514, 517–18 (1991) (quoting *Commonwealth v. Casale,* 381 Mass. 167, 173, 408 N.E.2d 841 (1980) (additional citations omitted)). Contrary to the Petitioner's claim, it would be virtually impossible for a jury to have concluded that the defendant was one of the perpetrators of the robbery, but that he lacked the requisite knowledge or intent to be liable as a joint venturer in the armed robbery/felony murder.

Gaines' defense to the crime was that it was a case of misidentification, a theme which his counsel pursued, and pursued well, at every possible opportunity. For example, the only eye-witness to the crime was the victim's son, Paul Sulfaro, who was 16 years old at the time of trial. Mr. Sulfaro originally selected photographs of other individuals, who were arrested for the crime. Petitioner's trial counsel questioned Mr. Sulfaro, the police, and others about the original identification. He further explored the motives of Lorene and David Bass, who identified the Petitioner, to lie to the police. David Bass operated a heroin shooting gallery out of his home, and the Basses had placed codefendants Gaines and Funderburg, and Anderson (who was tried separately), there after the robbery with money from the crime. One of the individuals originally identified by Mr. Sulfaro was Ms. Bass' son which, according to defense counsel, gave the Basses a motive to shift blame to Gaines.

Petitioner also claimed to have an alibi for the time of the shooting: he allegedly was on a bus to Iowa to visit the person he had just learned was his birth mother. This alibi testimony was clearly presented to the jury. In short, these and other inconsistencies in the witnesses' testimony were pursued to the ends of convincing the jury that the Petitioner simply was not there.

 In his habeas petition, Gaines argues that even assuming that he was at the scene of the crime, there was insufficient evidence to support a finding that he knew that either of his co-defendants were armed. To reach this conclusion, the Petitioner isolates a portion of Paul Sulfaro's testimony, which he interprets as being that Gaines was gone by the time the shooting started. Pet. Mem. at 22. Not only does this misconstrue Mr. Sulfaro's testimony, but it ignores other uncontroverted facts.

For obvious reasons, the shooting was not explored in detail at trial, nor was it necessary to do so since both defendants denied being there. Nevertheless, Mr. Sulfaro testified clearly that three men (later identified as Gaines, Funderburg

and Anderson) came into his father's shoe repair store together. Tr. 94. Gaines gave Mr. Sulfaro a description of a shoe and asked him if he could find it. *Id.* at 94–95. Funderburg stood near Gaines, near the cash register, while Anderson was wandering around the store. Tr. 95–96.

Mr. Sulfaro went to the back and found a shoe which matched the description given to him by Gaines. Tr. 95. However, Gaines and Funderburg "told me that it wasn't the shoe, so they asked me to change a dollar bill so they could call home to get the number that is on the claim slip, and when I opened the register, the guy (Gaines) reached into the till and grabbed some money." Tr. 95; accord Tr. 100. Thus, it is clear from this testimony that a jury could (if not must) find that the three were acting together in connection with the robbery of the store. Gaines was not an innocent bystander who just happened to be in the wrong place at the wrong time.

Contrary to the Petitioner's contention that no guns were drawn until after Gaines had left, the testimony was that a number of things happened virtually simultaneously: Paul Sulfaro tried to close the register drawer, guns were drawn by Funderburg and Anderson, the victim emerged from the back room of the store, shots were fired, one hitting and killing the victim, and the three exited the store together. As Mr. Sulfaro testified:

"I tried to shut the drawer, and then there were guns pulled out." While Gaines was at the register, Funderburg was "to his left and the other one was wandering around the store."

Tr. 95–96.

"Well, I tried to shut the drawer, and then they backed off and they were backing out, and my father was coming out, and then there were guns pulled out and there were shots fired."

Tr. 100. Mr. Sulfaro again testified that there were two men at the counter with

the register, Gaines and Funderburg, and Funderburg had a gun. Tr. 103. His testimony continued:

A. ... And they backed off, and they were firing, and they seemed to be firing—

Q. When you say they were firing, was Mr. Gaines firing?

A. No. There was the other man.

Q. A third man who's not present in the courtroom?

A. Right.

Q. Okay.

A. So they were backing out, and they were firing low, and my father came through the side entrance, ... and he got hit.

Q. Where did he get hit, Paul?

A. In the head.

Q. Point to it on yourself where he got hit.

A. It was—I believe right in the temple.

Q. And then what happened to him?

A. He dropped, and I looked at him, and they left.

Tr. 103–104. In response to cross-examination by Funderburg's attorney, Mr. Sulfaro again placed all three defendants in the room when the shooting started. Tr. 120 (after Gaines "grabbed the money, they seemed to be backing out, and then that's when things started—they started to fire.").

Gaines relies on the following testimony by Mr. Sulfaro to support his contention that he had already left the store when the shooting started, that the evidence describes only a "nonviolent taking of money from the cash register," and that "the evidence shows that the drawing of guns and shooting of Paul Sulfaro's father was a sudden act, unexpected and unintended by Petitioner." Pet. Supp. Mem. (Docket

# 57) at 5. As Mr. Sulfaro testified on cross-examination by Funderburg's counsel:

Q. All right. Okay. Now, at that point when you recall the firing, can you tell us where were the two men you've been talking about who were at the counter?

A. At the point of firing?

Q. Yes.

A. They were back out ready to make their exit.

Q. All right. Where was the third man at that point, sir?

A. On his way out, too.

Q. Were all three of these men at that one door trying to get out?

A. Yes.

Q. Is that your testimony?

A. I believe that the two—*Mr. Gaines was already gone,* and after there were the two there firing.

Q. That's what you believe?

A. Yes.

Tr. 123 (emphasis added). However, Mr. Sulfaro went on to testify:

Q. You're not sure of that?

A. I know that there were the two— *I'm not sure where Mr. Gaines was,* but I know there were the two men at the door firing.

Q. All right. Now, what did you do when the firing started, if anything?

A. Nothing.

Q. You just stood there?

A. Yes.

Q. Up front?

A. Yes.

Tr. 123–24 (emphasis added). Thus, a fair reading of Mr. Sulfaro's testimony is that everything was happening all at once, and that Gaines, while not holding a gun, was actively involved in all aspects of the robbery.

Additional evidence supports this conclusion. Mr. and Mrs. Bass both testified that all three defendants came to their apartment together and were out of breath, as if running. Tr. 315–16, 409–10. Funderburg's gun was stuck in his belt. Tr. 317, 410. Funderburg was saying to his co-defendants "when we get ready to do something and you get in the line of fire, you get hurt, too" or words to that effect. Tr. 319, 347, 412. There was also testimony from the Basses that Gaines took the money from the robbery, the three defendants went into the back room, Gaines left presumably to buy heroin, and then returned to join his cohorts. *See* Tr. 322–23, 415, 480, 495. Another witness, Alfred Harrison (Lorene Bass' son who was initially arrested for the crime) also testified that the three co-defendants arrived at the Bass apartment together and out of breath, and that Funderburg had a bulge under his coat. Tr. 492–93.

"The circumstantial evidence presented in this case was sufficient to permit a rational trier of fact to draw the inference that [Gaines] knew that he was assisting in the perpetration of an armed robbery." *Commonwealth v. Barry,* 397 Mass. 718, 493 N.E.2d 853, 856 (1986) (driver who brought armed assailants to scene, waited for them and drove them away guilty of armed robbery). There is no question that a jury could find that Gaines went to the shoe store for the purpose of robbing it— he was the one who induced Paul Sulfaro to open the register with a false story about needing change, and he was the one who grabbed the money. Nor is there any question that a jury could find that Gaines and the two armed defendants devised the robbery scheme together: they came into the store together, had a false story ready to go, left together and ran to the shooting gallery together where, the jury could infer, they had plans to buy and use heroin. Admittedly, there was no direct evidence

"of prior discussion or consultation among the actors which often appears in cases of armed robbery or other crimes committed by multiple offenders, and provides a basis for reasoning about the participants' awareness of or intentions with respect to weapons." *Commonwealth v. Ferguson,* 365 Mass. 1, 9, 309 N.E.2d 182, 187 (1974). However, given the prior planning that had to go into this robbery, a jury could infer such awareness of the anticipated use of weapons. *See Commonwealth v. Stewart,* 411 Mass. 345, 350–52, 582 N.E.2d 514, 517–19 (1991) (events prior, during and subsequent to shooting relevant to question whether defendant intended to kill or injure victim, when defendant did not do the shooting), and cases cited. Moreover, "there was evidence of a common venture, and a person joining in a robbery under conditions like the present, and apprehending that the intended victim might resist, could suppose that the other actors might be furnished with weapons, and in fact ... [guns] were used." *Id., quoted with approval in Commonwealth v. Watson,* 388 Mass. 536, 546 n. 9, 447 N.E.2d 1182, 1188 n. 9 (1983). Given that the defendant apparently participated in the planning of a robbery and in the robbery itself, a "jury could find that the defendant intended to participate in the commission of armed robbery, if that became necessary to carry out the enterprise." *Commonwealth v. Mangula,* 2 Mass.App.Ct. 785, 792, 322 N.E.2d 177, 181–82 (1975).

This case differs significantly from those relied on by Petitioner. For example, in *United States v. Randolph,* 93 F.3d 656, 664–65 (9th Cir.1996), the defendant Randolph carjacked a victim and released her unscathed after taking her vehicle and money. The defendant then left the scene. Co-defendants then drove up to the victim in a separate vehicle and assaulted her. Randolph did not participate in the assault and was nowhere near the site of the assault. Under such circumstances, the court concluded that there was insufficient evidence to support the inference that Randolph shared an intent to kill or harm the victim. Here, in contrast, Gaines was an active participant in the robbery and in the events leading up to (and following) the robbery. In *Commonwealth v. Avery,* 44 Mass.App.Ct. 781, 782–83, 694 N.E.2d 40, 41 (1998), two defendants were in the men's room when a man walked in. One of the defendants attacked the third man. There was no evidence that the defendant knew that an assault or robbery was planned by the assailant. In the instant case, in contrast, Gaines clearly knew that the robbery was going to take place. Here, unlike the other cases relied on by Gaines, there was evidence that "at the climatic moments, the parties consciously acted together in carrying out the criminal endeavor, each thereby becoming responsible for the acts of the other( )." *Id.* at 784, 694 N.E.2d at 42 (quoting *Commonwealth v. Fidler,* 23 Mass.App.Ct. 506, 513, 503 N.E.2d 1302 (1987)). Therefore, this court concludes that there was sufficient evidence to support Petitioner's conviction for armed robbery and felony murder. *See also Commonwealth v. Ortiz,* 408 Mass. 463, 467–69, 560 N.E.2d 698, 701–02 (1990) (evidence sufficient to warrant finding of joint-venture murder).

### 2. *The Jury Instructions*

In *Commonwealth v. Watson,* 388 Mass. at 546, 447 N.E.2d at 1188, the Supreme Judicial Court required that the jury be charged that an unarmed defendant must know that a co-defendant has a weapon in order to be guilty of felony murder based on armed robbery. However, this requirement has been limited to cases on direct appeal or as to which the time for direct appeal had not expired when *Watson* was decided in 1983. *Commonwealth v. Parham,* 390 Mass. 833, 845–46, 460 N.E.2d 589, 598 (1984), and

cases cited. Since Gaines' conviction was affirmed in 1978, there was no requirement of a specific charge as to his knowledge of the existence of the weapons.

In the instant case, the trial judge stressed the need for the jury to find that Gaines "combine[d]" and "confederate[d]" with others to accomplish the illegal purpose of robbery" in order for him to be liable for murder, even though he did not have a gun. *See* R.A. Ex. 10 at 925–27. Gaines had to "participate" in the robbery to be liable, and the perpetrators had to have a common design. *Id.* As the judge instructed the jury

> [I]t may occur to you as to why Gaines is charged with murder here, where the evidence is clear that he did not have a gun and he did not fire the fatal shot. There's no evidence of that whatsoever. So how is he in this picture on the basis of murder?
>
> Well, it brings into play a principle of law called the law of common enterprise, or joint venture, because it is settled law that if two or more persons *combine to commit a robbery* and a homicide results, each is criminally responsible for the acts of his associates in the perpetration of the *common design for which they conspired.* It is no defense for the associates engaged with others in the commission of a robbery that they did not intend to take life in the perpetration, because the law says that a person engaged in the commission of an unlawful act, to wit, robbery, is legally responsible for all the consequences which may naturally or freely flow from it, and that if he *combines and confederates* with others to accomplish the illegal purpose of robbery he is liable criminally for the

> acts of each and all who participate with him in the execution of the unlawful design. So that it is not necessary here, if all the other essential elements are present, that Gaines need have a gun in his hand or fired the fatal shot.
>
> You must be satisfied beyond a reasonable doubt, in the first instance, that Gaines was in the shoe shop *participating in the robbery.* If there is a doubt in your mind as to his presence, you need go no further. You acquite [sic] him.

R.A. Ex. 10 at 925–27 (emphasis added)

The joint venture instruction also included a bank robbery example involving a lookout, a getaway driver, a man putting a gun to the teller's head, and a man who "scoops up the cash." *Id.* at 927. The judge instructed that in this situation, all four participants are guilty of armed robbery and murder, if the man with the gun shoots the teller, provided that the killing was a "consequence which naturally and necessarily flowed from the commission of the armed robbery." *Id.* at 927.[8] During a later part of the charge, the judge explained joint venture in the context of armed robbery as follows:

> Armed robbery is accomplished when one or more of the perpetrators is armed with a dangerous weapon. A dangerous weapon is any instrument which, as so used or as so designed, is capable of inflicting grievous bodily harm upon another.
>
> For the aggravated crime of armed robbery to occur, it isn't necessary that the trigger be pulled. It's sufficient that one of the perpetrators has that weapon in his possession.

Pet. Mem at 28. However, as detailed above, the evidence is sufficient to find that Gaines knew the others were armed or was on notice that a dangerous weapon was likely to be used.

---

**8.** Gaines claims that this example was confusing because there was no evidence that he knew that his co-defendants were armed and that Mr. Sulfaro testified that there were no guns displayed when he took the cash. See

In respect of Gaines and Funderberg, if they were there, Gaines is alleged to have taken the money out of the cash register, Funderberg and Anderson are alleged to have had the guns. The matter of common enterprise comes in, just as in the case that I told you about, the imaginary case of the bank robbery.

So are you satisfied beyond a reasonable doubt that these two men were in the shoe shop, that an armed robbery occurred, and that each was acting jointly with the other? If they weren't acting jointly, if there is a reasonable doubt in your mind that they weren't acting jointly, then each is only responsible for what the other did.[9]

Tr. 942–43.

While not as clear as later required by *Watson,* the charge did make it clear that the jury had to find that Gaines "associated himself with a criminal venture and participated to some extent in the commission of the crime." *Commonwealth v. Stewart,* 411 Mass. 345, 358–59, 582 N.E.2d 514, 522 (1991) and cases cited. As detailed above, if the jury found that Gaines was at the shoe shop and that he was the individual who entered with the armed co-defendants, induced Paul Sulfaro to open the register, grabbed the money from the register and ran out with the others, there was more than sufficient evidence for the jury to find that knew that his co-defendant was armed. Any error in the jury instructions did not rise to the level of a constitutional violation, and there was no substantial risk of a miscarriage of justice.

9. In the context of the charge, this final phrase is clearly a misstatement. Rather, the charge was undoubtedly intended to be to the effect that if they were not acting jointly, each was responsible for their own conduct. The court must view the instruction in entirety,

### 3. *Ineffective Assistance of Counsel*

 Petitioner's final claim with respect to his joint venture liability is that it was ineffective assistance of counsel [10] to have failed to challenge the jury instructions on appeal, although he had objected at trial. *See* Pet. Mem. of Law at 9–10. The review of such contentions has been described "as requiring a determination 'whether the issues which (the defendant) claims appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial, and were so obvious from the trial record that the failure to present such issues amounted to ineffective assistance of appellate counsel.' " *Commonwealth v. Sowell,* 34 Mass.App.Ct. 229, 232, 609 N.E.2d at 494, 495 (1993) (quoting *Gray v. Greer,* 800 F.2d 644, 647 (7th Cir.1986)). Assuming arguendo, that the jury instructions relating to Gaines' shared intent with his co-defendants were insufficient, the failure to raise the issue on appeal did not constitute ineffective assistance of counsel.

The standard to be applied to ineffective assistance of counsel claims is defined by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the *Strickland* court held:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This required showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a

and cannot judge this single statement in "artificial isolation." *See Cupp v. Naughten,* 414 U.S. at 146–47, 94 S.Ct. 396.

10. Trial counsel was also appellate counsel.

trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. Gaines cannot meet this standard.

Counsel repeatedly stressed Gaines' defense that the case was one of mistaken identity, and that he was simply not at the scene of the crime. The issues raised on appeal also focused on the identification issues. *See Commonwealth v. Funderberg,* 374 Mass. at 581–82, 373 N.E.2d at 965. As detailed above, once Gaines was found to be a participant in the robbery, it was a virtual certainty that a jury would find that he had the requisite intent to be liable under a joint-venture theory. To raise the intent argument would be inconsistent with the misidentification defense, and would call the appellate court's attention to the details of the emotionally-charged testimony of the victim's minor son. Failure to raise this issue on appeal reflects a tactical decision which does not support a claim of ineffective assistance of counsel. *See Genius v. Pepe,* 147 F.3d 64, 66 (1st Cir.1998), *cert. denied,* 526 U.S. 1121, 119 S.Ct. 1773, 143 L.Ed.2d 802 (1999). "The defense at trial reasonably was premised on the defendant being totally uninvolved in the [shooting] and not being present at the time of its occurrence. Appellate counsel, therefore, logically focused on evidence that implicated his client and not on the tangential matters now argued by the defendant that are more distantly related to the central issue." *Commonwealth v. Sowell,* 34 Mass.App.Ct. at 234, 609 N.E.2d at 495.

### V. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Petition for Writ of Habeas Corpus be DENIED.[11]

**11.** The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir.1998).